McKENNA, Circuit Judge
(orally). In this action the complainants claim the right to redeem a-piece of land in Contra Costa county, called “Los Meganos,” or “Marsh Ranch.” The respondents have the legal title, but complainants allege it was received in trust for James T. Sanford, and now held in trust for complainants, as his legal representatives. To quote from Mr. Stanly’s argument: “The record, bill, answer, and proof show that long prior to the connection of any party to this suit with the subject-matter the title had become so vested that 01/ioo undivided parts belonged to one set of owners, and %oo belonged to another owner or owners.” All parts, however, became vested in James T. Sanford prior to July 3, 1872, and afterwards passed from him, dividing again for a while, and afterwards uniting again in the respondents; and complainants, counsel says, therefore are affected by different states of facts and different rules and principles of law. The 99/ioo parts came to Sanford by deed dated November 1, 1871, the deed being from Charles P. Marsh, and Alice F. and William Cameron. The deed recited that it was subject to a mortgage for $259,333 of the purchase money, and two deeds of trust *55 made by Marsh to E. W. Burr and B. D. Dean. The mortgage was duly foreclosed, and the property bought in by Alice E. Cameron and Charles P. Marsh. The first, and, I think, the material, controversy, is about the redemption from this sale, and the parties by whom and the character in which the money was furnished. However, on the 3d of July, 1872, Sanford conveyed all of the property to the Brentwood Coal Company, and the latter gave him a mortgage to secure $90,000 of the purchase price. This mortgage was assigned by Sanford to one Bowdoin on the 12th of May, 1873, “upon the terms and conditions contained in a certain agreement between the parties hereto, bearing even date herewith.” This agreement shows that the assignment was in trust to secure the payment of a certain number of promissory notes made by Sanford to various parties, all of which were made April 1, 1873, and to become due at various dates in 1874. By the agreement recited they were made and delivered on the day of the agreement, to wit, the 12th day of Maw 1873. The agreement recites that Sanford delivered the mortgages to secure the payment of the notes severally, as they should fall due, and Bowdoin accepted the mortgages for such purpose, and, if they should be paid as they fall due, he will, upon the request of Sanford, deliver up and satisfy the first-mentioned mortgage, and reassign to him the second. If the notes be not paid when due, Bowdoin, at the request of any holder of them, shall proceed to collect the whole and all of them, by foreclosing said mortgages, or by such other legal process as may be lawful for that purpose in the state of California, and the property described in the first mortgage was to be sold first, and, if a surplus remained, it to be paid to Sanford, and the Brentwood Coal Company’s mortgage reassigned to him. If the sale should not produce sufficient to pay the obligation, the premises in second mortgage to be sold, and the surplus, to the extent of $90,000, to be paid to Sanford, and the balance, if any, to the Brentwood Coal Company. If all the premises should not realize sufficient to pay the obligations, the amount realized to be divided proportionately. The Marsh-Cameron mortgage was foreclosed, as I have said, and the property bought by Alice Cameron and Charles Marsh for the sum of $199,183.80. It was redeemed on the 28th day of July, 1875, in the name of George S. Bowdoin. The certificate reciting the right to redeem was based on the mortgage made by the Brentwood Coal Company to Sanford, and assigned by him to Bowdoin, both of which have been described above. This certificate he assigned to E. W. Burr as security to the Savings & Loan Society for $150,000, which the corporation had advanced, and which sum was used in part to effect the redemption. To whom this sum of $150,000 was advanced is one of the contentions of the parties; the complainants contending it was advanced to Sanford, the respondent contending it was advanced to Bowdoin, and that he furnished the balance of the money. I think the evidence shows it was advanced to Sanford, and that he furnished the balance of the money. It is too conclusive to admit of doubt.
*56 The redemption was made on the last day allowed by law. Bowdoin made no movement to redeem. It was first intended to redeem in Sanford’s name. Afterwards, and almost at the last moment of time, it was resolved to redeem in Bowdoin’s name. Bowdoin’s testimony is eonclusiye of it. He made no movement to redeem, and on application of Sanford allowed his name to be used, expressly agreeing to subordinate the rights he had as trustee to the lien of the money required for redemption, and with extreme care stipulated against liability of himself and those he represented. In his deposition he testified that he authorized the redemption of the property, but not for the parties he represented. “It was redeemed in my name,” he said, “but I did not furnish the money, or borrow it. I came to make the redemption, because Mr. Sanford said, through my counsel, that if I redeemed he would furnish the money; and my object was that, in the event that the property realized more than Sanford paid, he would be able to meet the balance of the notes which I still held against him, he having already paid the first maturing notes. I did not authorize the borrowing of the money from the Savings & Loan Society for the purpose of making the redemption, and I did not authorize the borrowing of any money from any person or corporation.” As to the assignment of the certificate, he testified he first assigned it by telegraph, and afterwards in writing, but neither borrowed nor authorized the borrowing of any money on it, “and the assignment, I presume, from what my counsel told me, was on behalf of Mr. Sanford.” This testimony shows conclusively that Bowdoin did not borrow from the Savings & Loan Society the $150,000 as claimed by it. The testimony further shows that the balance of the redemption money was furnished by Sanford by drafts from New York, and by sums raised here on his credit.
These facts establish a trust in favor of Sanford to the extent of the interest conveyed by the assignment of the certificate of redemption. Hidden v. Jordan, 21 Oal. 92. This redemption, and the relations established by it, become the test of the case, and explain all that took place afterwards. By the foreclosure and sale of the 91/ioo, the balance, 9/ioo, was left subject to the mortgage from the Brentwood Coal Company to Sanford, which we have seen was assigned to Bowdoin in trust. The Brentwood Coal Company was adjudged bankrupt by the district court of the United States of the Southern district of New York, and one George H. Carey was duly appointed assignee of the estate, and was duiy authorized to sell, and did sell, the estate of said company in said 9/ioo of said rancho free and clear of any lien thereon, of the mortgage of the company to Sanford; the lien to attach to the proceeds of the sale; and George S. Bowdoin became the purchaser thereof. The court subsequently authorized the said' assignee to take the receipt of Mr. Bowdoin for $45,000 in payment for the property; that is, to accept his receipt, which was virtually the receipt of Sanford for that much of the debt of the coal company to him. There are a number of other transactions in which Sanford conveyed interests in the rancho after the redemption from *57 the foreclosure sale, and there were sales for taxes, and sales under a judgment obtained against him by F. A. Eaton, who had advanced part of the money for the redemption from the Marsh and Cameron foreclosure sale. These interests were purchased by the Savings & Loan Society.
On whose account they were made, as well as the purchase of the %oo of the rancho from Bowdoin, is the second contention of the parties. Sanford, immediately after the redemption of the foreclosure sale of the Marsh mortgage, went into possession of the land, made leases to others, and disposed of its rents and profits; and it is claimed that in consideration of the surrender of the agricultural portion to the bank, he retaining the house and certain grounds, the bank was to advance to him funds sufficient to purchase said claims and pay off certain enumerated indebtednesses. The agreement was afterwards modified, it is further claimed, to include the surrender of the house and grounds; and in lieu of their retention Sanford was to receive a certain monthly sum. This is denied by the bank, but I think it is supported by a fair preponderance of the testimony. The oral testimony is conflicting, but there are circumstances in the case which cannot be accounted for on any other supposition. The value of the property supports it. It was sufficient to make the bank secure. Interlocutory decree for complainant, with reference to the master for an accounting.
(February 23, 1897.)
McKENNA, Circuit Judge.
The controversy in this case was as to the status of certain tracts of land described in the bill,— whether the respondent society was the owner of them, or whether they were held in trust by it for Sanford to secure the sum of $150,000 and interest, and certain advances and disbursements. The interlocutory decree determined the latter. Upon what facts and reasoning, is set out with sufficient explicitness in my decision rendered October 3, 1893. The interlocutory decree referred the cause to E. H. Heacock, Esq., master in chancery, to take and state and report to this court a full, just, and true account between the parties complainant and defendant herein. The terms of the decree, as far as necessary, will be given hereafter. In pursuance of the decree, the master took the account, and made his report January 9, 1896, to which each party has filed exceptions on various grounds, the principal and most important of which are the expenditure of the defendant for taxes and the claim and allowance of interest. As to the taxes the report is as follows:
“The mortgage interest of the Savings & Loan Society in the Los Meganos Bancho has never been separately assessed; but the Savings & Loan Society has from year to year had the entire property, except the lots sold in the town of Brentwood, assessed to itself, as the owner thereof. The decree directs: ‘That in taking and stating said accounts, allowance be made by said master * * * to the defendants herein for all sums expended by them * * * for taxes or assessments upon real property, or any part thereof, or the appurtenances thereof, except taxes on, or representing the mortgage interest of the defendant the Savings & Loan Society, or in the redemption of said property, or any part thereof, from sales for taxes or assessments, or in the acquisition of tax titles thereto (unless such tax sales or titles are founded on *58 taxes representing the mortgage interest of the defendant the Savings & Loan Society).’ A mortgage is declared by section 4, art. 13,' of the constitution, for the purpose of assessment and taxation, to be an interest in the property affected thereby. The property is assessed, which assessment necessarily includes the mortgage interest. The assessment creates a lien upon the property, and gives the basis for taxation. The tax is levied. The owner of the mortgage must pay the tax upon the mortgage interest; the owner of the property must pay the tax upon the excess. No reassessment is required; it is only necessary to apportion the amount of the taxes between the parties. Since November, 1878, the Savings & Loan Society has been continuously in the possession of the property, and under section 8 of article 13 of our constitution it was its duty to make and deliver annually to tbe assessor, under oath, a statement setting forth all real and personal property owned by it or in its possession or under its control; and section 3629 of our Political Code requires the assessor to exact from each person a statement in writing, including, among other things, ‘all mortgages, deeds of trust, contracts and otner obligations by which a debt is secured, and the property in the county affected thereby.’ The fact that the law likewise required Sanford to make such statement does not excuse the Savings & Loan Society from so doing. Sanford had placed the Savings & Loan Society in the possession of the property. It thereby became the steward and bailiff of Sanford, and thus undertook to faithfully do and perform all and every act necessary to be performed to protect the property, and Sanford might well have relied upon the 'Savings & Loan Society in the matter of the assessment of the property, as well as the paying of the taxes levied thereon, and all other matters pertaining thereto.”
On tbe argument of tbe exceptions to these conclusions of tbe master a great many things have been urged which do not seem to me to be relevant. The question is the simple and direct one,— what has either party paid or received on the account of the other? What (to confine the inquiry directly to respondents) legal obligation of complainants have they discharged, which either at complainant’s request or by right of law they did discharge? In answering this as to the taxes, two periods must be regarded,—that before the new constitution took effect, and that after it took effect. In the first period there was no mortgage tax. That on the land was its owner’s burden, without diminution for anything, and hence there was no division of interests. It was all Sanford’s,—ownership and burden,—and hence, as to this period, the master found no embarrassment, and counsel have made no complaint. In the second period the constitution makes a division of interests,—divides them into that of the mortgagor, who is the owner, properly so called, and into that of the mortgagee; and under the constitution the interests are assessed to their respective owners (article 13, § 4), and any contract made after that time, by which the debtor (mortgagor) is obligated to pay such tax, shall, as to such tax, be null and void (Id., § 5). It is objected to the application of these provisions that they do not apply to a deed intended as a mortgage; that they only apply to a mortgage, in form such, to a deed of trust, in form such; and it is urged further in support of this construction that the machinery of the law is inadequate to assess any other but formal mortgages or deeds of trust. I do not think either proposition is tenable. Not the first, because it is manifest that sections 4 and 5 should be taken together, and were intended to include all forms by which money could be se *59 cured; and it would have been of little avail to have avoided a contract by which a debtor obliges himself “to pay any tax or assessment •on money loaned, or any mortgage, deed of trust, or other lien,” if the result could be produced by the easy and not uncommon form of a deed. Not the second, because the machinery of the law provides for not only what the records may show, but for the disclosures of the parties under oath,—as adequate a method as can be applied to men, •and, as far as the state is concerned, completely adequate, the value •of the visible land being the basis of taxation, whether as one interest or as two interests.
It is further urged that the complainants have alleged that the |150,000 was borrowed by Sanford and advanced by the Savings & Loan Society to him “upon the understanding that the same was to bear interest at the rate of 1 per cent, per month,” which means •(counsel urge), “as a matter of course, without any diminution or •deduction.” And, further, “No mortgage tax could have been contemplated by either party, or even thought of, for none existed.” The same comment is made upon the reduction of the interest in March, 1878, from 12 per cent, to 10 per cent. The business habits and the practice of the profession (of which the court may take Judicial notice) oppose this view. It was the universal practice in mortgages, where such was the contract, to insert a provision for payment by the mortgagor, not only of the tax on the land, but on the money loaned. It was not considered that this result was secured by the rate of interest. But, further, in the case of Hay v. Hill, 65 Cal. 383, 4 Pac. 378, the supreme court of California held that under a mortgage made before the new constitution the mortgagor was entitled to be paid after the new constitution for the taxes he paid on the mortgagee’s interest. The court said:
“There was no contract between the mortgagor and mortgagee by which the former agreed to pay the taxes upon the mortgaged premises, the obligation -of which was impaired by the provisions of the new constitution. It is said that, to hold that the mortgagor is to be allowed the sum by him paid for ■taxes assessed against the mortgagee is to relieve him from the payment of a •part of the money which he agreed to pay. But a power superior to both has relieved the mortgagor of a part of the taxes he was previously bound to pay, and has imposed upon the mortgagee a tax upon property previously not taxable. The mortgagor never owed the mortgagee any money for taxes. Under the former system he owed the state the taxes assessed upon the whole •valuation of the property; under the present system he owes the state primarily the tax upon the value of the property, less the mortgage debt, and the mortgagee owes the tax levied on the mortgage interest. The mortgagor, having paid an amount due from the mortgagee to the third party,—the state, —is entitled to recover the amount so paid. McCoppin v. McCartney, 60 Cal. 371.”
We are hence brought back to the inquiry of the rights and relations of the parties. The master found that the respondent society was the agent or steward of Sanford, and as such was charged with the duty of giving a statement to the assessor, with the interests of itself and Sanford separately described: There is some reason for so concluding, but I do not think it is necessary. The society undoubtedly claims to have been the owner of the property, :and it might not be wholly unreasonable to charge it, as a con *60 sequence of the claim, with the payment of taxes, without the right of reimbursement at all. But, at any rate, its interest was-to the extent of the money loaned and advanced; Sanford’s interest was the balance of value. Confounding them in one assessment did not alter them or enlarge them. The society had a right of reimbursement only, not of relief from obligation. Its right of reimbursement came from what it paid for Sanford; this, and nothing more; and it paid only what Sanford was liable for, to-wit, the taxes on the value of the land, less the value of the security. These were the relative rights of the parties, and the-master has adjudicated them with care and accuracy, disregarding form and doing substantial justice.
As to interest, the master, in his report, states as follows:
“The most important questions involved in this accounting are those relating to the charges for interest. This arises from the lapse of time since the-transactions involved in the accounting occurred, the original loan of $150,000 having been made on the 26th day of July, 1875, and the major portion of the subsequent advances having been made in the years 1878, 1879, and 1880. This action was commenced on May 1, 1882. By whose fault, if fault there has been, it was not long since determined, does not appear. The questions involved in the accounting were finally submitted to the consideration of the master upon written arguments on the 31st day of May last. The Savings & Loan Society, in stating its accounts, has, during the entire time from the-date of the original loan, on the 26th day of July in each successive year charged interest on the original loan of $150,000 at the rate of 12 per cent, per annum, and upon all subsequent advances and disbursements at the legal rate from the date of each of such payments; and has, on the 26th day of July in each of such years, charged interest at the legal rate on the total amount of the accumulated interest remaining unpaid of previous- years upon-the original loan and the subsequent advances and disbursements. The interlocutory decree herein is wholly silent as regards interest; nor does it direct-the master, in stating the account, to make any rests whatever.”
Tbe master field that the defendant bank was entitled to interest from the date of the loan, to wit, the 26th day of July, 1875, to tfielst day of April, 1878, at 12 per cent, per annum, and from the latter date to final judgment at the rate of 10 per cent, per annum. Plaintiff excepts to this finding, and urges that the defendant should, in no event, be allowed interest on the sum of $150,000 loaned by it to the original complainant at the rate of 12 per cent, per annum for any period of time except from the date of the loan (26th of July, 1875) down to the 1st day of April, 1878; nor should it be allowed interest on said sum at any greater rate-than that of 10 per cent, per annum from the said 1st day of April, 1878, nor for any longer time than down to the 1st day of April, 1879; nor should it be allowed interest on said sum at any greater-rate than 7 per cent, per annum from the 1st of April, 1879, nor-for any longer period than down to the 1st day of October, 1881. The original bill contains the following allegations;
“That at the time said Savings & Loan Society advanced said sum of $150,000 to said James T. Sanford, as aforesaid, no written evidence of such, indebtedness was given by said James T. Sanford to said Savings & Loan Society by way of promissory notes or otherwise, owing to the fact that at that time said James T. Sanford was absent from the state of California, and in the city of New York, and the expiration of the time for redemption of said property from said execution sale was then imminent, and did not admit. *61 of delay; but said money was advanced, as hereinbefore stated, upon, the understanding that the same was to bear interest at the rate of 1 per cent, per month; but in the month of March, 1878, said Savings & Loan Society agreed to reduce the rate of interest from 12 per cent, per annum to 10 per cent, per annum.”
The interlocutory decree finds affirmatively “that each, every, and all the allegations in the original bill of complaint * are true.” This is very general, and the tenability or nontenability of complainants’ contention must be determined by the agreement or understanding of the parties as established by the evidence. It is very clear what the original agreement was,—very clear that there was an agreement to reduce the interest to the rate of 10 per cent, per annum after the 1st of April, 1878. The plaintiff, however, contends that the debt became matured at this time, or, at the furthest, one year thereafter; and hence, that from either of these times the interest should be 7 per cent. This view is attempted to be supported by the following cases: Brewster v. Wakefield, 22 How. 127, Burnhisel v. Firman, 22 Wall. 176, and Holden v. Trust Co., 100 U. S. 72. But it is fairly disputable if the law of California, as expressed in its statutes, and declared by its courts interpreting them, is not the other way. This, however, is not necessary to be decided. I think, as the master did and found, that the agreement of the parties was, at first, that the original loan should bear interest at 12 per cent, until the debt was paid; that the only alteration of this agreement was that the interest should bear, after April, 1878, 10 per cent, until the principal loan, advances, and disbursements should be paid. If the testimony needs confirmation, it finds it in the universal understanding and practice of the state.
This brings us to the proposition, should interest extend “for any longer period than down to the 1st of October, 1881?” That it should not, plaintiffs’ counsel contends, because Sanford, in September of that year, requested an accounting of the bank, and the latter refused the request, and denied his rights,—asserted an absolute ownership of the property. The bill alleges as follows:
“That the annual income derived from the farming of the same [that is, the rancho] on shares, as the same has wont to be farmed, has at times exceeded .?40,000, and at other times has not been equal to that amount. That from the fall of 187G up to about November, 1878, said James T. Sanford was in the actual possession of said Rancho Los Meganos, and on or about the last-named date, at the request of said Savings & Loan Society, he surrendered possession thereof to said Savings & Loan Society, and from thence hitherto said Savings & Loan Society, by itself and tenants thereon, has been, and still is, in possession of the same, and in receipt of the income arising therefrom. That up to on or about the month of September, 1881, said Savings & Loan Society recognized and admitted that it held possession of said lands, and all title thereto held by it in its name or in the name of any one else for its benefit, merely as security to secure repayment of the indebtedness of said defendant James T. Sanford to said Savings & Loan Society. But on or about the month last mentioned said defendant for the first time repudiated and ignored the rights of complainants therein, and refused to render any account to said Sanford of his indebtedness to said Savings & Loan Society, of the rents, issues, and profits of said property, of the disbursements attending the same, or of any matters pertaining thereto; then claiming to be the absolute owner of said property, and disavowing any right, title, or in *62 terest therein in the complainants herein, or either of them. That at the time said Savings & Loan Society advanced said sum of $150,000 to said James T. Sanford, as aforesaid, no written evidence of such indebtedness was given by said James T. Sanford to said Savings & Loan Society by way of promissory notes or otherwise, owing to the fact that at that time said James T. Sanford was absent from the state of California, and in the city of New York, and the expiration of the time for redemption of said property from said execution sale was then imminent, and did not admit of delay, but said money was advanced, as hereinbefore stated, upon the understanding that the same was to bear interest at the rate of 1 per cent, per month; but in the month of March, 1878, said Savings & Loan Society agreed to reduce the rate of interest from 12 per cent, per annum to 10 per cent, per annum. That said Savings & Loan Society has from time to time in divers ways made advances for account of and to said James T. Sanford, made disbursements and assumed liabilities on like account, but when and what the amounts thereof were these complainants are unable to state. That they have applied to said defendant for said statement of account, but defendant wholly refuses to render the same, or to in any way recognize their rights in the premises. That these complainants are ready and willing to pay, and they hereby offer to pay, to said Savings & Loan Society, such sum as may, upon a just and proper accounting, be ascertained to be due by said James T. Sanford to said Savings & Loan Society.”
These allegations were answered by denials and admissions, some of which only we are now concerned with. The denial of the demand for accounting was as follows:
“And this defendant Savings & Loan Society further severally answering, saith it denies, and these defendants Albert N. Drown, E. W. Burr, and George Mearns severally believe such denial to be true, that said Savings & Loan Society has refused to render any account to said James T. Sanford of the rents, issues, and profits of said property, or of the disbursements attending the same, or of any matter pertaining thereto; and they severally admit that it then claimed and now claims to be the absolute owner of said property, and then disavowed and now disavows any right, title, or interest therein in the said complainants, or either of them; and that at the time said Savings & Loan Society advanced said sum of $150,090.34, as is hereinbefore stated, no written evidences of indebtedness therefor were given by said James T. Sanford to said Savings & Loan Society, by way of promissory notes or otherwise.”
From the act of refusal to account, as alleged, and the offers of the bill, complainants contend that Sanford was excused from a tender or offer of performance under the Code of California, and that they are entitled to the benefits which would result from an offer and refusal; and one of the benefits, it is claimed, was that the interest stopped running on the obligations. To support this contention the following sections of the Civil Code of the state are cited: Section 1504, also sections 1511, 1512, and 1515. It is objected by defendant that (1) these provisions are not applicable to a suit in equity when the party claiming them is plaintiff; that they are only available in defenses; and (2) only apply to bilateral contracts, of which, it is claimed, the transaction between Sanford and the bank is one. But the first contention seems to be answered by the case of Chielovich v. Krauss (Cal.) 11 Pac. 781, in which the court said:
“The mode of offering prescribed in the chapter of the Civil Code headed ‘Offer of Performance’ (section 1485 et seq.) applies as well to offers of performance which operate a redemption (Civ. Code, § 2905) as to other offers to perform. Such offers must be made with ‘intent to extinguish the obligation,’ since the lien can be extinguished only by extinguishing the obligation. Sec *63 tlon 1500 provides that an obligation to pay money is extinguished by a due offer of payment ‘if the amount is immediately deposited in bank,’ etc. It follows that an offer to pay by one who seeks to redeem from a mortgage must be made in the same way. AA’hen Kortright v. Cady, 21 N. Y. 343, wras decided, there was no New York statute which prescribed the mode in which-an offer to perform must be made.”
The case is not elaborately reasoned, but it may have been thought by the court that the meaning of the statute was obvious-enough not to need much explanation. However, in the case at bar, there is no question of an offer of performance, or of tender of' performance. Neither was done, and this is attempted to be excused by the acts of the respondent bank. The stress of the controversy is on the meaning and application, under the facts of the-case, of section 1511. Sections 1512 and 1515 do not apply. They depend on other facts than disclosed in the present case. Section 1511 is as follows:
• “Sec. 1511. The want of performance of an obligation, or of an offer of' performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate:
“(1) When such performance or offer is prevented or delayed by the act of the creditor, or by the operation of law, even though there may have been a. stipulation that this shall not be an excuse:
“(2) AA’hen it is prevented or delayed by an irresistible superhuman cause, or by the act of public enemies of this state or of the United States, unless the parties have expressly agreed to the contrary; or,
“(3) When the debtor is induced not to malte it, by any act of the creditor-intended or naturally tending to have that effect, done at or before the time at which such performance or offer may be made and not rescinded before that time.”
The two first subdivisions cannot be claimed to obtain in this, case. In the third there are two elements: (1) The act of the creditor, (2) its effect on the debtor. The latter must have been induced by the other; the other must have been intended or naturally tended to have that effect. That the act of the bank was intended to prevent an offer of performance cannot be claimed; and if we may assume, as a matter of law, it naturally tended to that effect (which is certainly very doubtful, as we shall see hereafter), the-inquiry remains, was it the inducement of Sanford’s want of action? This is, certainly, almost wholly a question of fact, and, I think, should be clearly made out. The testimony is not very certain. Sanford was asked:
“Q. 194. AVill you state wlien you first beard or learned tbat the bank set up-any adverse claim or denied your right to the property? A. About the 7th of September. Q. 195. Of what year? A. About the 7th of September, 1881. About that time is the first positive denial by the bank. On the 7th of September X demanded an accounting of Mr. Brickell, the president. He referred’ me to the board. Q. 196. Previously, you say, when the arrangement was-made? By the way, you have not fixed that. Was that in March, 1878, that that arrangement took place? A. Yes, sir; March, 1878.”
And this is the whole of his testimony on direct examination. It was not a positive refusal even of an account. He was referred to the board, but does not appear to have done anything further. On cross-examination he further testified as follows:
“Q. 788. You say that you first learned that the bank set up any claim to the property adverse to yourself on or about the 7th of September, 1881?- *64 A. Previous to writing the letter to Mr. Brickell. I was in the bank after you had left [Mr. Drown was examining him, and the answer was addressed to Mr. Drown], and I was not satisfied with the manner in which he received me; and that is the first treachery that I suspected, really. Q. 789. You say you had not met Brickell before in the matter? A. Before when? Q. 790. Before he became connected with the bank as president. A. But that letter was written to him as president. Q. 791. How, then, do you call it treachery on his part, he not being familiar with it, not having taken part in the transaction with yon? A. What date did you say? Q. 792. September 7, 1881. A. He was president of the bank then. I had had conversations with him previous to September, 1881. Q. 793. What difference was there in September, 1S81, from what had been previous to that? A. Then I put the question to him. I made the demand for an accounting. I first applied to you to give me the account, and you said you would. You then told me the bank refused to do it. Then I went down and demanded an accounting of him, and he refused; referred me to the board. He then denied that I had any interest in the ranch. He said he did not understand that I had any interest there at all. Q. 794. Had he ever said that he did understand that you had any interest there? A. In conversations that I had had with him before I supposed he understood precisely how the matter rested between us. He denied it then.”
This testimony does not justify the rigorous conclusion which complainants draw from it. There is not a syllable in it which justifies the inference that Sanford was induced to make no formal offer of performance by the reply received by him. There is nothing in the testimony to show that at that or any subsequent time prior to the commencement of the suit he had the ability to perform, and, interpreting the pleadings, there is nothing in them to indicate that in Sanford’s opinion any precedent act of his had excused him from the fullest performance of the contract as he admitted it to be, or excused the payment of any part of the interest. Pleading an offer of performance or an excuse for it would seem to have been (if not necessary in law) very natural, and its omission is significant of how. Sanford regarded his relations with the bank. That an offer in the bill to perform has not the effect to stop interest, was decided in Randall v. Duff, 101 Cal. 82, 88, 35 Pac. 440. The master based his opinion of the liability of the complainants for interest on the equitable rule that seeking equity they must do equity,—a maxim not always easy to apply. It would seem, in the abstract, that if one had rights under the law it would not be offensive to equity to assert them. But a distinction has become very firmly fixed by the cases, and based on considerations of equity, that there are rights available to a defendant which may not be to a plaintiff. This is illustrated by the law of tender, by the defense of usury, and by that of the statute of limitations. In Kortright v. Cady, 21 N. Y. 343, it was held that the tender of the money due upon a mortgage at any time before foreclosure discharges the lien, though made after the law day, and not kept good. The action was to foreclose a mortgage, and the tender as a defense by Cady, who was a subsequent grantee of the equity of redemption. But in Tuthill v. Morris, 81 N. Y. 94, it was held that, to entitle a mortgagor to maintain an action to extinguish the lien of his mortgage because of a tender of the amount due and a refusal to accept it, the tender must foe kept good, basing this upon the rule that he who comes into *65 equity for affirmative relief must himself do equity. Kortright v. Cady was not referred to. In Nelson v. Loder, 182 N. Y. 288, 30 N. E. 369, the distinction between these cases was observed, and the court, by Mr. Chief Justice Follett, affirmed Kortright v. Cady, but said:
“If a debtor wishes to extinguish his liability for subsequently accruing interest, or demands some affirmative relief, he cannot retain the money, subject to his own use, but must devote it to the specific purpose of paying the debt, and put it within the power of the creditor to receive it at any time. He must keep his tender good. Tuthill v. Morris, 81 N. Y. 94, 100; Harris v. Tex, 55 N. Y. 421, 425; Gyles v. Hall, 2 P. Wms. 378; Bishop v. Church, 2 Ves. Sr. 371; Garforth v. Bradley, Id. 675; Stow v. Russell, 36 Ill. 18; Jones, Mortg. § 892; Thomas, Mortg. § 399; Coote, Mortg. (4th Ed.) 885. A subsequent lienor’s right to redeem a prior" security is derived from the owner of the mortgaged premises, and he is in this respect in no better position than the owner; and his tender, if he wishes to stop interest, or compel an assignment of the prior lien, must be as absolute and specific as that which the owner is required to make as a ground for affirmative relief or to stop the running of interest.”
See, also, Werner v. Tuch, 127 N. Y. 217, 27 N. E. 845.
Illustrations of the different effects of the plea of usury and of the statute of limitations as it may be urged by a plaintiff or a defendant might be given, but it is unnecessary, because the effect of the equitable maxim in this case is not necessary to decide. Nor is it necessary to consider how far the case of Mattingly v. Pennie, 105 Cal. 520, 39 Pac. 200, applies or controls. It may not be easy to define meaningly what is and what is not a bilateral or unilateral contract from the definitions of the books. In ultimate analysis all contracts have bilateral obligations, and the distinction between those which are expressed and those which are implied is a vague test. And, query, if a loan of money is a unilateral contract, as the definitions seem to make it, is a pledge of property such a one? But, as I have already said, I am free from the embarrassment of answering the query, my decision being placed upon another point.
There were two exceptions which I disposed of at the oral argument, but which I may now repeat: That to the salary of an assistant superintendent of the rancho, and that to the failure of respondent to charge itself with $4,000 received for the River property. The first is disallowed. I think the charge for the assistant superintendent is a proper charge. The second is allowed. While the River property was no part of the rancho, it was of the security, and the amount realized by its sale is a proper credit. Let a decree be entered accordingly.