EARLE v. ART LIBRARY PUB. CO. et al.

(Circuit Court, E. D. Pennsylvania. June 30, 1899.)

1. EQUITY PRACTICE—ANSWER AS EVIDENCE AGAINST CO-DEFENDANT.
    The answer of a defendant cannot be read as evidence on the question of the existence of a partnership between such defendant and one deceased, as against the administrator of the decedent, who is a co-defendant.
2. SAME—DENIAL ON INFORMATION AND BELIEF.
    An answer merely denying an allegation of the bill on information and belief is sufficient to put the allegation in issue, and place the burden of

proof on the complainant, but not to require the testimony of two witnesses, or of one and corroborating circumstances, to establish it.

**3. PARTNERSHIP—EVIDENCE TO ESTABLISH.**

Where it is shown that a partnership existed between three persons, and on the retirement of one the other two issued a statement announcing that they would continue the business, and they did so through the same agencies, and with unchanged assets and liabilities, such statement and course of dealing are sufficient to establish the existence of a partnership between them as to the property and business of the old firm.

**4. SAME—TRANSFER OF INTEREST BY PARTNER—RIGHTS OF CREDITORS.**

After a firm is actually insolvent, a partner cannot, by a transfer of his interest to his co-partner, constitute the assets of the firm the individual property of the latter as against the partnership creditors.

On Exceptions by James S. McCartney, Administrator, to Report of Special Master.

The report and findings of E. Hunn Hanson, special master, were as follows:

From the evidence of William S. Jackson, the bookkeeper of William Finley & Co. and of the Art Library Publishing Company, and from the entries in their books of account, the following facts appeared, and they are all that are relevant and material to the matter in issue, which have been legally established:

(1) On the 16th December, 1892, a partnership was formed under the name of William Finley & Co., for the purpose of conducting a publishing business, chiefly of books for which subscriptions had been obtained by general agents; and was continued until 3d August, 1897. No agreement in writing was signed by the partners, but on the leaf opposite the first one ruled for entries in the day book of the firm, and which contained entries from December, 1892, to March, 1897, and in three hundred and eighty-five pages, there was the following:

"Philadelphia, December 16, 1892.

"Wm. M. Singerly, C. W. Beck, and Wm. Finley have this day formed a co-partnership for the purpose of carrying on a general publishing business, etc., under the style and title of Wm. Finley & Co. Each partner is to have an equal share in the business, and the gains and losses to be divided equally. Wm. Finley is to receive fifty dollars (50) per week for his services in conducting the business. C. W. Beck is to have power to sign all negotiable paper necessary for conducting the business. Wm. M. Singerly is to invest five thousand dollars in the business, and to receive six (6) per cent. per annum on all investments exceeding that amount.

"3/17/95. W. S. J."

This entry was made on the 17th March, 1895, by the bookkeeper, upon the authority of the three partners. In the ledger of the partnership, under the loss and gain account, there are entries of 1st August, 1896, 1st June, 1st July, and 1st August, 1897, by which each partner is credited with one-third of the profits. The money capital was contributed by William M. Singerly, and by August, 1897, it amounted to $28,982.01.

(2) Upon the 3d August, 1897, a written agreement was executed by the three partners, of which the following is a copy:

"This indenture, made between William Finley, William M. Singerly, and C. W. Beck, witnesseth: That whereas, the said William Finley, William M. Singerly, and C. W. Beck have heretofore dealt as co-partners in the general publishing business, etc., under the style and title of William Finley & Co., and by their joint trading many goods and wares belong to and are the property of the said co-partnership, and debts are due unto them arising from the conduct and management of said business, wherein every of them hath an interest, and likewise in the conduct and management of said business the said parties as co-partners have become and are liable and are indebted to divers persons concerning the said joint trading: Now the said William Finley, in consideration of the sum of $2,750 paid to him by the said William M. Sing-

erly, by and with the consent of C. W. Beck, the receipt of which said sum of money the said William Finley doth hereby acknowledge to have received from the said William Singerly, doth consent to and doth hereto by this writing sever himself from the said joint trading and co-partnership with the said William M. Singerly and C. W. Beck as above mentioned, and doth by these presents hereby grant, assign, sell, transfer, and set over unto the said William M. Singerly all the right, title, property, and interest of every kind and character which he, the said William Finley, now hath or hereafter should have in and to, all and singular, the goods, wares, merchandise, and debts in any wise appertaining to the business conducted as above mentioned, and the said William Finley for himself doth covenant, promise, and agree to and with the said William M. Singerly and C. W. Beck that he, the said William Finley, will not, from this date, in any way interfere with, or attempt to interfere with, the business of said co-partnership, and that he will not receive or discharge, or attempt to receive or discharge, any of the goods or debts mentioned above, or do any act or thing to hinder the said William M. Singerly and C. W. Beck from receiving the same, and conducting and managing the said business, but will permit and aid the said William M. Singerly and C. W. Beck to recover and acquire the same to their own use, benefit, and advantage, without any account to be rendered therefor to him, the said William Finley; and that he, upon request, will do any reasonable act which may be requested of him to discharge or aid the said William M. Singerly and C. W. Beck to recover and receive the same; and in consideration of the foregoing the said William M. Singerly for himself doth covenant that he will at all times hereafter pay and discharge all the creditors to whom the said William Finley now standeth chargeable and indebted for and concerning all the affairs and dealing of said firm mentioned above, and will at all times hereafter indemnify and save harmless the said William Finley, his heirs, executors, and administrators, from all debts and liabilities, and every of them, of the said firm. It is a part of the consideration of this agreement that the said William M. Singerly will guaranty, and he does hereby covenant, promise, and agree, to pay at its maturity a certain note now held by the wife of William Finley for money loaned by her to the said co-partnership for the sum of $2,500. In testimony whereof the said parties have hereunto set their hands and seals this third day of August, A. D. 1897.

|  |  |
|---|---|
| William Finley. | [L. S.] |
| "William M. Singerly. | [L. S.] |
| "C. W. Beck. | [L. S.] |

"Signed, sealed and delivered in presence of:
"James S. McCartney.
"M. F. Hanson."

Thereafter William Finley's connection with the business ended, and a business was continued by William M. Singerly and C. W. Beck under the name of Art Library Publishing Company. It was of a character similar to that of William Finley & Co. In its books the same credit of interest was made to the capital account of Singerly of the amount in excess of $5,000 as had been entered in the books of William Finley & Co. pursuant to the provisions of the agreement dated 16th December, 1892. It continued the same general agencies as those of William Finley & Co. On the 14th August, 1897, it caused a notice of the change to be sent to those who dealt with it. The notice was as follows:

"Art Library Publishing Company.

"Burd Building S. W. Cor. 9th & Chestnut Sts.

"Successors to William Finley & Co., 1113 Market Street.

"Philadelphia, August 14, 1897.

"Mr. William Finley Withdraws.

"On August 3rd, 1897, the firm of William Finley & Co., publishers, of Philadelphia, was dissolved; Mr. William Finley absolutely withdrawing therefrom, and ceasing to have any interest in it whatever. The business will be continued upon the same lines, and with new and added features, by the successors, under the form and title of the Art Library Publishing Co.

"Charles W. Beck, President.

"James S. McCartney, Secretary & Treasurer."

It caused to be opened a new set of books of account, and on pages 2 and 3 of the journal were the following headings:

Page 2: "August, 1897. On August 3, 1897, the firm of William Finley & Co., publishers, dissolved. The business will be continued by the successors under the form and title of the Art Library Publishing Company. The new firm assume the resources and liabilities of the old firm dissolved.

"Resources: [Then follow twenty-eight items aggregating $121,631.81.]"

Page 3: "August, 1897. Liabilities assumed by Art Library Publishing Company: [Then follow one hundred and twenty-three items, aggregating also $121,631.81.]"

The interests of William M. Singerly and C. W. Beck were not the same in the Art Library Publishing Company as they had been in William Finley & Co. The former was to receive a half of the profits, and the latter a fourth. The other fourth was to be paid James S. McCartney for taking charge of finances of the new company. The solvency of the Art Library Publishing Company was ended by the failure on 23d December, 1897, of the Chestnut Street National Bank, of which William M. Singerly was president, and from which it had obtained its discounts. At the end of 1897 the bookkeeper of the Art Library Publishing Company estimated its profits, and understood they should be credited to the account of William M. Singerly, C. W. Beck, and James S. McCartney each a third. He was instructed by W. T. McClenthen, who, as the agent of William M. Singerly, examined the books of account of the Art Library Publishing Company, that Singerly should have a half, Beck and McCartney each a fourth, and this was done accordingly, as of the close of the year 1897. The following entries appear:

To the credit of C. W. Beck by profit and loss................ $1,337 69
" " James S. McCartney, profit and loss.......... 1,337 67
" " William M. Singerly, profit and loss........... 2,675 40

(3) Under date of February 10, 1898, in the journal of the Art Library Publishing Company (page 53), an entry appears as follows:

Jas. S. McCartney................................. $250 00
W. M. Singerly........................... $250 00
Services as treasurer for 10 weeks from Nov. 19, 1897, to Jan. 28, 1898.

On page 51, under date of 17th February, 1898, are these entries:

Jas. S. McCartney Dr. to........................... $753 94
W. M. Singerly per a/c................... $753 94
Transfer as of Jany. 1st as per understanding.

The explanation of the first entry is that McCartney received $250 from Singerly personally for his services as treasurer. No explanation was made of the understanding in the second entry, and it was asserted that the $753.94 was turned over to Singerly's account. Upon page 34 of the same book Singerly is credited and McCartney charged with $300 services as treasurer for twelve weeks, from September 3d to 19th November, 1897. At page 69 of the last book of the Art Library Publishing Company, under date of March 19th, McCartney is charged with $175 in full for services from January 28, 1898, to date. The entries relating to the $300 were pursuant to the written request of Singerly by letter of 18th December, 1897. In the journal of the Art Library Publishing Company (page 54) there is an entry 17th February, 1898:

C. W. Beck Dr. to............................. $5,342 06
W. M. Singerly personal acct................... $5,342 06
Transfer of Jany. 1st as per understanding.

It was explained to mean that Beck on that date transferred to Singerly all of the accumulated profits standing on the books to his credit. Under date of 19th March, 1898 (page 63 of the same journal), are these entries:

Wages Dr. to Sundries............................. $773 70
To close accts. of J. S. McCartney & Charles W. Beck for their services as officers as per understanding:

Charles W. Beck (651).................................... $313 70
Jas. S. McCartney (324)................................... 460 00

These entries last named were made at the direction of McCartney.

. (4) William M. Singerly died February 27, 1898. At the time ·of the suspension of the Chestnut Street National Bank the notes held by it, and upon which the Art Library Publishing Company and William Finley & Co. were liable as makers or indorsers, amounted to $53,928.14.

Conclusions from the Foregoing Facts, with the Legal Principles Applicable to Resolve the Matter under Consideration.

The answer of Charles W. Beck· to the amended bill and to its interrogatories is distinctly responsive, and it admits that William M. Singerly and the respondent were co-partners under the name of the Art Library Publishing Company, continuing the business which, in common with William Finley, they had conducted under the firm name of Wm. Finley & Co. The answer of James S. McCartney to the same pleading of the complainant is also responsive so far as it relates to the respondent's business relations with C. W. Beck and William M. Singerly, and that which is averred in this behalf prevails as evidence, there having been adduced none sufficient to meet and overcome it. This answer further alleges, upon understanding and belief, that Beck was not a partner, but an employé, of Singerly's in the Art Library Publishing Company, and the respondent's answer in this connection to the interrogatories to the bill ·aver that he is unable to speak of his own knowledge as to Beck's partnership ·relation. It was objected that the answer of Beck could not be read as evidence of a partnership between him and Singerly. The general rule in chancery is that the answer of one defendant cannot be read against his co-defendant, since the latter has no opportunity to cross-examine. There are exceptions to the rule, and one is that the answer of one partner may be read against ·his co-partner. Field v. Holland, 6 Cranch, 8; Clarke's Ex'rs v. Van Riemsdyk, 9 Cranch, 153. ·This, however, must be understood of living partners, for, where one of the partners is deceased, the reason of the rule applies with redoubled force. On the part of the complainant it was urged that Beck had been called by him, and examined as a witness, and the administrator of Singerly had the opportunity to cross-examine. Such, however, is not the cross-examination of one having detailed knowledge, nor from the source contemplated by the rule. Hence the answer of Beck, which is effective as an admission with respect to himself, cannot be read in evidence on the question of partnership between himself and Singerly, who is deceased.

It was argued on behalf of McCartney, as administrator, that there was wanting the testimony of two witnesses, or of one with circumstances to overcome the denial of his answer with respect of the alleged partnership of Singerly and Beck in the Art Library Publishing Company. Such testimony is requisite where the answer is responsive, and founded upon the knowledge of the respondent. McCartney's answer is upon information, but it omits to state from whom it came, and of what it consisted; and the belief is doubtless upon such information, or an inference from facts not set forth. It is therefore no more than pleading, whereby the matter alleged and so denied upon belief is put in issue. Clarke's Ex'rs v. Van Riemsdyk, 9 Cranch, 153; Riegel v. Insurance Co., 153 Pa. St. ·134, 25 Atl. 1070. In the issue thus formed, the burden of showing that the property of the Art Library Publishing Company is that of a partnership is wholly upon the complainant, but no more or different evidence is necessary to establish that fact than . to prove any other. Whether or not there was created between Singerly and Beck a co-partnership after 3d August, 1897, when William Finley retired from the firm of William Finley & Co., depends upon their intention to that end; and, since there was no written agreement between them, such intention, if it existed, can be discovered in this case not otherwise than from their course of conduct and admissions with respect to the business carried on. It was not disputed, and could not have been successfully, that there did exist a partnership between Singerly, Beck, and Finley under the style of William Finley & Co. Such terms as it had are expressed in the writing dated 16th December, 1892, which, although it was not signed, was written at the instance of the three. It existed from that date to 3d August, 1897. The partners were equally interested. Singerly contributed $5,000 as capital, upon which no interest was to be paid him. Upon his subsequent contributions interest was to be paid; and the entries in the books of account of the firm are in accordance with the provisions of the paper writing of 16th December, 1892. From these books it appeared that the business had been a successful one, and each partner was credited in

the ledger with the moneys in excess of expenses and cost of management which had accrued from its conduct. Upon the 3d August, 1897, William Finley ceased to be a member of the firm, pursuant to the paper writing of that date. Thereupon Singerly and Beck, under the style of the Art Library Publishing Company, announced themselves to those with whom the firm of William Finley & Co. had dealings theretofore as successors of that firm, and as intending to conduct the new business on the same lines as the old, with new features. In the books of account of the Art Library Publishing Company it was designated as a new "firm," and it assumed the liabilities and resources of the former one, a detailed list of each being set forth. Accordingly, the same sort of business was carried on by the Art Library Publishing Company in a similar manner to that of William Finley & Co., through the same general agents, and with unchanged resources and liabilities. Such statement and course of dealing by Singerly and Beck plainly and clearly manifest the intention inter sese to become partners in the business so conducted; and it is therefore concluded that on the 3d August, 1897, there existed a co-partnership between Singerly and Beck with respect to the partnership property and business theretofore of William Finley & Co.,—a conclusion not disturbed by the fact that they arranged for a distribution of expected profits differently from that which each had in the firm of William Finley & Co.

On behalf of the administrator of Singerly it was urged: First. That after 3d August, 1897, Singerly was the owner of all the capital in the Art Library Publishing Company, and Beck's interest was solely in the expected profits, and hence all the assets of the Art Library Publishing Company belonged to Singerly as his individual property. Second. That, if such was not the result of the facts stated, that result was brought about by Beck's transfer to Singerly of all of the former's interest in the business, and the receipt of a weekly sum as a salary.

I. It is true that all of the money capital of William Finley & Co., and of its successors, the Art Library Publishing Company, was furnished by Singerly, or through his credit. Both concerns, however, had other property than such capital. Beck was entitled to $4,661.88 as his share of accumulations from William Finley & Co., and this was one of the liabilities assumed by the Art Library Publishing Company, just as it assumed a liability to Singerly for $8,622.04 in addition to the $28,982.01 capital contributed by him. And there was also, it would seem, that peculiar kind of property known as "good will," which in a business of this character presumably had value. Hence all of the assets—or, in other words, all of the partnership property—did not belong to Singerly individually.

II. Nor did that result from the transfers evidenced by the entries of 10th and 17th February, 1897, by which the interest in the business which theretofore stood to the credit of Beck on the books of the Art Library Publishing Company was transferred to the credit of Singerly. In the insolvent condition of the company. Beck has a right to have the debts paid out of its property other than capital, and then out of capital, before he shall contribute individually; and it ought to appear much more distinctly than it does from the entries of 10th and 17th February that he abandoned such right, even were he capable of doing so. But let it be assumed that it was the purpose so to invest Singerly with all of the property of the partnership, and to give Beck no interest in it beyond a weekly salary; Beck could transfer no greater right than he had, and that which he had in his behalf, and all that he had, was such share of the property which would be disclosed to be his after the payment of the partnership debts and a settlement of the accounts between the partners as such. At the time these entries were made, the Art Library Publishing Company was insolvent, and its creditors had an equitable right of payment from its property prior to that of the other creditors of each partner; a right which has its foundation in that of the partners among themselves to have their partnership property so applied in the first instance. And while it is settled that this right can be exercised by the creditors only through that of the partners, it is thought that the latter are no more than channels through which the rights of the creditors flow, and that in chancery the partners are powerless, by sale, transfer, or otherwise, to disappoint such administration of partnership and individual property. From the foregoing it is finally deter-

mined that the proceeds of the sale of the assets of the Art Library Publishing Company by the receiver are the property of the partnership of Singerly and Beck, who conducted their business under the name of that company; that the petitioning creditor of the company is entitled, through the equitable right of Beck, to have such assets so administered that they shall first discharge the debts owing by the company; and that the property from the sale of which such assets were obtained was not the individual property of William M. Singerly during his life. A form of decree· in conformity with this conclusion is respectfully submitted.

The exceptions to the foregoing report were referred to the special master, who reported thereon as follows:

The exceptions raise three matters for resolution: First. The alleged partnership between Singerly and Beck after 3d August, 1897. Second. The imputed agreement between the two that Beck should be a partner (if one at all) in profits only. Third. The assignment or transfer by Beck of all of his right in the assets of the business, so that Singerly became and was, when he died, its sole owner.

(1) The facts with respect to the alleged partnership between Singerly and Beck after 3d August, 1897, are scarcely questioned. They are not denied, and are set forth in detail in the report. From these, and from these alone, it was and is inferred that the two intended the partnership relation inter sese. The inference is believed to be a strictly logical one. In the absence of a written partnership agreement (and in this case there was none), it is not easy to imagine a case in which the facts more potently demand this conclusion.

(2) When a partnership relation is found to exist, the presumption is that the partners have equal rights and duties, and, if the right of one is simply in profits, that is to be established by some evidence, or there are some facts to be found from which it may be logically concluded. There was no evidence of any kind that Beck was a partner simply in the profits, and there were no facts from which this was inferable. It is true that all the money capital had been contributed by Singerly, but all, or the greater part, of the business management was that of Beck. The business was a peculiar one, and an element of very great value in it was good will. In this Beck was equally interested with Singerly, and Beck took into the business an accumulation of profit from that business which preceded it, and which was not named capital, but in the bookkeeping treated as such. Hence it was, and still is, thought that, if Beck were a partner in profits, it was not made so to appear.

(3) The book entries of 17th February, 1898, are referred to as manifesting the transfer by Beck of all of his right in the assets of the business. It is not doubted that a partner may devest himself of all right in the assets, and invest his partners with them, so that creditors who otherwise would be entitled to payment from partnership assets cannot so claim, because that claim must be advanced through the equity which a partner has to have joint assets applied to partnership debts in the first place. But this transfer must be in good faith, not alone free from fraud, but in such conscience that the partnership creditors shall not be disappointed in the marshaling of the assets. And it is not either in good faith or conscience when made on the verge of insolvency, still less after actual though not declared insolvency. It has been found as a fact that the solvency of the Art Library Publishing Company "ended by the failure on 23d December, 1897, of the Chestnut Street National Bank, of which William M. Singerly,was president, and from which it had obtained its discounts." The transfer relied upon with so much confidence took place nearly two months after the solvency of the partnership so ended. At another time and place it might be not unpleasant, and even profitable, to follow the review of the cases to which the undersigned was invited for the purpose of discovering a principle of general application. But the matter in hand does not call for this. There is no well-considered case in which, on the eve of insolvency, a transfer of the kind under consideration has been deemed such an act of good faith to partnership creditors as to be upheld by a chancellor. In this connection the expression of Woodward, J., in Backus v. Murphy, 39 Pa. St. 397, commends itself as in a proper cause maintaining not only the right or equity of. a partner, but the right of a partnership creditor. He says (page

402): "That is to say, whilst any partnership property remained, either partner might apply it or compel its application to the firm debts, and for this purpose might avail himself of the equity powers of the courts. And, possibly, creditors might compel him to allow them to use his name for this purpose if he were backward in protecting their rights." Hitherto this matter has been treated as though Beck actually assigned or intended to assign to Singerly, but the entries relied upon fall short of manifesting such an assignment. Above all, Beck's answers to the specific interrogatories filed, while not evidence against Singerly, are evidence against himself, and he has answered to the fifteenth interrogatory that by the transfers in the books of the Art Library Publishing Company he made no sale of any interest in the partnership assets to Singerly. None of the exceptions are sustained.

Asa W. Waters and W. H. Addicks, for receiver.

J. Howard Gendell, for exceptions.

McPHERSON, District Judge. I have considered carefully the reports, arguments, and testimony in this case, and am of opinion that the exceptions of Mr. McCartney, as administrator of William M. Singerly, must be overruled. I agree entirely with the learned master's findings of fact, with the inferences of fact that he draws therefrom, and with his conclusions of law. It would be superfluous to restate what he has already put so convincingly, and accordingly I shall content myself with adopting his reports as the opinion of the court. The exceptions are dismissed.