SAVINGS & LOAN SOC. et al. v. DAVIDSON et al.

(Circuit Court of Appeals, Ninth Circuit.. October 2, 1899.)

No. 399.

1. APPEAL—REVIEW—NECESSITY OF ASSIGNMENTS OF ERROR.
To entitle an appellant to an examination by the circuit court of appeals of any question, he must file assignments of error presenting such question before the appeal is taken, as required by the rules.

2. EQUITY—CONFORMITY OF RELIEF TO BILL—SUFFICIENCY OF AVERMENTS.
Where the facts alleged in a bill and shown by the proofs establish a trust, or the existence between the parties of fiduciary relations which entitle the complainant to the relief prayed for, he is not debarred from such relief solely because he did not aver, as a legal conclusion, the existence of a trust or fiduciary relation arising from such facts, but alleged an express trust.

3. REVIEW ON APPEAL—QUESTIONS OF FACT—PRESUMPTION OF CORRECTNESS OF DECREE.
On appeal to the circuit court of appeals, the findings and decree of a circuit court as to the facts are taken as presumptively correct, and, unless it clearly appears from the record that some mistake has been made in the consideration of the evidence, the decree should not be disturbed.

4. EQUITY—ANSWER AS EVIDENCE—EVIDENCE TO OVERCOME.
The rule that two witnesses, or one witness and corroborating circumstances, are required to overcome a sworn answer asserting a fact responsively to the bill, does not apply where the reason upon which it is based fails, as when the answer is by a corporation, and is verified by the oath of one who has no personal knowledge of such fact, or where, in case of an answer made by an individual, his testimony as a witness shows that he did not have such personal knowledge, or is in conflict with the answer.

5. RESULTING TRUST—RIGHTS AND DUTIES OF TRUSTEE—DISABILITY TO ACQUIRE ADVERSE TITLE.
Under the settled rule in California. established first by decision and later by statute, that where property is conveyed to one person, and the

consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom the payment is made, and under the provisions of Civ. Code Cal. §§ 2229, 2230, 2234, defining the rights and duties of trustees, where a bank loaned to a mortgagor a portion of the money required to redeem property from a foreclosure sale, the remainder being furnished by the mortgagor, and the redemption being effected by acquiring the outstanding certificate of sale, and causing the property to be conveyed to a representative of the bank, the bank held the title as a trustee for the mortgagor, to whom it was bound to the exercise of the utmost good faith in dealing with the property, and it could not, without his knowledge, acquire outstanding titles and interests adversely to him and for its own benefit, but such titles and interests will be deemed to have been procured for his protection.

6. SAME.

Such case differs from an express passive trust, in which the trustee has no duty to perform except to convey to a designated person a specified title, in that the bank was vested by the conveyance with the entire interest of the mortgagor in the property, whatever such interests might be, and the bank was bound to preserve such interest in good faith, and restore it on payment of its claim, unimpaired by any hostile act of its own.

7. MORTGAGES—RIGHTS INTER PARTES—RIGHT OF REDEMPTION.

Even conceding that the bank held title to the property as mortgagee only, such relationship bound it to act with fairness and good faith towards the mortgagor, and it could not purchase an outstanding title, and hold it adversely to him, where it led, or designedly permitted, him to believe that such title was acquired for his protection, and in such case he is entitled to redeem on reimbursing the bank for its expenditures.

8. SAME—RECOVERY BY MORTGAGEE OF TAXES PAID.

In a suit by a mortgagor to redeem from a deed which was, in legal effect, a mortgage, where, under the laws of the state, the mortgage and the equity of redemption were taxable separately to the respective owners, but the mortgagee had procured the property to be assessed to itself as owner, and had paid the taxes thereon, it is entitled to recover from the mortgagor only so much of such taxes as were in excess of the amount it should have paid on its security.

Appeal from the Circuit Court of the United States for the Northern District of California.

John Garber and Robert Y. Hayne, for appellants.
Garret W. McEnerney and W. B. Treadwell, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is a suit in equity to redeem about 13,000 acres of land situate in Contra Costa county, Cal., known as the "Los Meganos Rancho" or "Marsh Ranch." It has been lingering in the courts for many years. The bill of complaint was filed May 1, 1882. The taking of testimony was continued from time to time, and innumerable delays, from various causes, occurred before the case was finally brought to trial. The circuit court delivered an opinion therein on October 3, 1893, in favor of complainants' right to redeem, and an accounting was then ordered. Thereafter, on February 23, 1897, a final decree was rendered (Sanford v. Society [C. C.] 80 Fed. 54), from which the present appeal is taken. There are 69 formal assignments of error in the record, reduced to

11 in the brief of appellants, which really include every point embraced in the formal assignments.

The transactions out of which the litigation arises date back to 1871, and, in many respects, are complicated. The testimony upon several material points is decidedly conflicting. The record, as brought to this court, contains 2,689 printed pages, and the briefs of counsel cover, in addition thereto, 490 pages, and they cite nearly 400 authorities in support of their respective contentions. The record shows that the suit was originally brought by Harriet A. Sanford and James T. Sanford, as complainants, against the Savings & Loan Society, Albert N. Drown, E. W. Burr, and George Mearns, as defendants. The death of some of the parties accounts for the change that has been made in the parties to the suit.

The bill of complaint, among other things, alleges: That on November 1, 1871, Charles P. Marsh and Alice F. Camron conveyed ninety-one undivided hundredths of the ranch in question to James T. Sanford. That a mortgage was given upon said land to secure the payment of certain promissory notes, amounting to $259,332.23. That Sanford paid upon said notes and mortgage $92,539.44. That the mortgage was foreclosed, and property sold, under decree of foreclosure, January 26, 1875, to Marsh and Camron for $199,183.80. That prior to July 3, 1872, Sanford acquired the title to the nine undivided hundredths of the property, and on that date conveyed to the Brentwood Coal Company, a corporation, the entire land. That the said corporation, on May 10, 1873, executed and delivered to Sanford a mortgage of said land to secure the payment to him of the sum of $90,000. That on May 12, 1873, Sanford assigned this mortgage, and the debt thereby secured, to George S. Bowdoin, in trust to secure the payment of certain sums of money due to various creditors of Sanford. That on July 26, 1875, being the last day on which the premises sold under foreclosure could be redeemed, "Sanford through and in the name of said George S. Bowdoin, and said George S. Bowdoin for the use and benefit of said James T. Sanford, did redeem said mortgaged lands and premises" from the foreclosure sale; "said James T. Sanford furnishing $122,648.23 in gold coin of his own proper money, and $150,000 then and there by him borrowed of said defendant the Savings & Loan Society, for the purpose of making said redemption." That, in order to secure the repayment to the bank of the sum of $150,000 so borrowed, Sanford caused and procured said Bowdoin to assign the certificate of redemption to the defendant E. W. Burr. That on November 9, 1875, the sheriff, who made the foreclosure sale, conveyed to said Burr, as assignee of the certificate of redemption, the property so sold and redeemed, being $^{91}/_{100}$ of said ranch. That on July 29, 1881, by the procurement of Sanford, and for the purpose of better securing said sum of $150,000, said Bowdoin executed and delivered to the defendant Albert N. Drown an assignment of said certificate of redemption, and of all rights accruing to him thereunder, and assigned and transferred to the defendant George Mearns the mortgage of the Brentwood Coal Company which Sanford had theretofore assigned to said Bowdoin, in trust as above stated, and also

conveyed to the defendant Drown the $^0/_{100}$ part of said ranch, the title to which had theretofore vested in him through Sanford, and also quitclaimed to said Drown all his right, title, and interest of, in, and to the whole of said premises. That the defendant Burr was the president of the defendant Savings & Loan Society. That the defendant Albert N. Drown was the attorney for said society, and the defendant George Mearns its searcher of records. That neither of them had any real interest in any of the assignments or conveyances, or paid any part of the money therefor, but that the same were taken and held by them, respectively, solely as security to the bank for the money advanced by it. That at various times thereafter the bank, at the request of Sanford, and for his benefit, purchased several outstanding titles created by Sanford in the property, some of which conveyances were made to the bank, and others to the other defendants, but for the benefit of the bank. That all of said purchases were made by the bank for the purpose of clearing Sanford's title, and were held by it only as security for the payment of the money so advanced by it. That no written evidence of the said indebtedness to the bank was ever given, but the money was advanced upon the understanding that the same was to bear interest at the rate of 1 per cent. per month. That in the month of March, 1878, the bank agreed to reduce said rate of interest to 10 per cent. per annum. That on December 11, 1875, Sanford conveyed the property to one Harriet Sanford by a deed which, though absolute in form, was designed by the parties thereto as a mortgage, to secure certain indebtedness due to said Harriet Sanford. That on October 12, 1881, whatever title was acquired by Harriet Sanford was then conveyed by her to Harriet A. Sanford. That from the fall of 1876, up to November, 1878, Sanford was in the actual possession of the premises. That about the last-named date, at the request of the bank, he surrendered possession thereof to the bank, and it has ever since been, and still is, in possession of the same, and in receipt of the income arising therefrom. That up to September, 1881, the bank recognized the rights of the complainants, and admitted that it held possession of the lands, and of all title thereto held by it in its name, or in the name of any one else for its benefit, merely as security to secure repayment of the indebtedness of Sanford to it. That about September, 1881, the bank for the first time ignored the rights of complainants, and refused to render an account to Sanford, of his indebtedness, or of the rents, issues, and profits of the property, or of the disbursements attending the same, or of any matter pertaining thereto, and then, for the first time, claimed to be the absolute owner of said property. That the bank has from time to time, in divers ways and manners, made advances for the account of and to said Sanford, and made disbursements and assumed liabilities on his account, the amounts of which are unknown to complainants, and the bank has refused to render the same, or in any way to recognize his rights in the premises. The bill of complaint contains an offer to pay to the bank such sum as may, upon a just and proper accounting, be ascertained to be due it, and prays that an accounting be taken of the amount due from the com-

plainants, or either of them, to the bank; that it be adjudged that the defendants hold the land merely as security for the amount so due; that, upon payment of such amount, the defendants be decreed to convey the premises to the complainant Harriet A. Sanford, and to account for all money realized from the rents, incomes, profits, or otherwise of the property; and for general relief.

The answer is quite lengthy. It admits the deraignment of title, and of the making of most of the conveyances, but denies the character of some of them. It presents two material issues of fact: First, whether or not the redemption made in the name of Bowdoin was made by or for Sanford, and whether or not the $150,000 loaned by the bank was loaned to Bowdoin or Sanford; second, whether or not the subsequent purchases by the bank were made for the benefit of Sanford, or through his procurement, or were made in hostility to him. Upon the first of these issues the answer alleges that said redemption was made by said Bowdoin with the sum of $121,928.27 "furnished by himself," and the further sum of $150,090.34 "then loaned and advanced to him by said Savings & Loan Society." The answer denies that Bowdoin made said redemption for the use or benefit of Sanford, and alleges that the defendants have no knowledge or belief as to whether Sanford furnished to said Bowdoin any money so used in said redemption, or whether he caused or procured Bowdoin to assign the certificate of redemption to Burr, and leaves complainants to make proof of those allegations. It admits that the assignment of the certificate of redemption to the defendant Burr was made "to secure the repayment to said Savings & Loan Society of said sum of $150,090.34 so loaned and advanced by it to said George S. Bowdoin, and also to secure the payment by said Bowdoin to said Savings & Loan Society of interest on said last-named sum from said 26th day of July, 1875, until paid, at the rate of 1 per cent. per month"; and, with reference to the conveyance by the sheriff, the answer alleges "that the said lands were so conveyed in order thereby to continue to said Savings & Loan Society the security granted by said assignment of said certificate of redemption for the repayment by said George S. Bowdoin to said Savings & Loan Society of said sum of $150,090.34 so loaned and advanced by it as aforesaid, and of the interest thereon agreed to be paid as hereinbefore stated, and that said Burr received and held the title to said lands vested in him by said sheriff's deed for said last-mentioned purpose and for none other." Upon the second issue, the answer denies that any of the subsequent purchases were made by the bank by the procurement of Sanford, or for his benefit, but alleges that the same were made in hostility to him and to the whole world, and for the purpose of vesting absolute title in the bank, and that the bank did thereby acquire the complete, legal, and equitable title to the whole premises, subject to no claim on the part of any person. The answer denies that Sanford surrendered possession to the bank at its request, but avers that, after the Eaton sale to the bank, he voluntarily removed, to avoid being dispossessed, and that ever since November 16, 1878, it has been in possession.

With reference to the value of the property, four apparently disinterested witnesses were examined by the complainants. One testified that its fair market value was $500,000, another placed it at $400,000, and the other two at $450,000. The defendants introduced two witnesses, one an employé of the bank, who testified the value to be $350,000, and the other, a director of the bank, who placed it at $300,000. These values were given principally—without reference to the coal deposits—as to its value for agricultural purposes. The decided weight of the testimony exceeds $400,000.

The outstanding titles mentioned in the pleadings are: (1) On March 16, 1878, one F. W. Eaton obtained a judgment against Sanford for $17,932.15, under which there was an execution sale of the $91/100$ of the ranch to one Jeremiah Miller, to whom the certificate of sale was given. On November 16, 1878, this certificate of sale was assigned by Miller to the Savings & Loan Society, and on November 18, 1878, the sheriff's deed was made to the bank as the holder of said certificate. (2) In October, 1876, Sanford made a conveyance of all his right, title, and interest of $91/100$ of said ranch to the firm of Richardson, Hill & Co., upon an agreement complicated in its character, but which, in effect, might be said to make the transaction a mortgage with power of sale, and the firm advanced money to Sanford on this security, and subsequently, on March 24, 1879, conveyed the premises to the bank in assumed exercise of the power of sale mentioned in the agreement. (3) On November 27, 1878, Russell F. Lord gave a quitclaim deed of his interest in the ranch to the bank in consideration of $10,000. It does not appear that he ever had any title or any interest, except that of possession. (4) The bank purchased the Bowdoin interest or claim for $8,000.

There was a claim of $30,000 by McAllister & Bergin, which Sanford testified the bank was to compromise and settle. The bank did not procure this claim. The amount of the claims secured by the bank was about $122,000. They were purchased for less than $50,000. Appellants contend that these outstanding titles and claims were bought in order to enable the bank to procure a clear title, and get possession of the property, so that it could put the same in marketable shape and realize on it.

The Brentwood Coal Company was a corporation organized for the purpose of developing and working the coal deposits on the Marsh ranch. Its principal stockholders were James T. Sanford and John F. Williams. In controversies and suits between them, it was claimed by Williams that he was the real owner of the property, and that Sanford was a mere mortgagee; and it is argued by appellants that, while Sanford was the president and a director of the corporation, he took advantage of his position, and committed a fraud upon Williams, in making the redemption, and that under no circumstances is he entitled to recover herein, because he does not come into court with clean hands. To determine this question would involve an extended examination of the evidence contained in the record and of the authorities bearing upon this subject. Neither the facts nor conclusions contended for by

appellants are clearly apparent by the record, and it is strenuously contended by the appellees that the facts contained in the record clearly show that Sanford, at the time the redemption was made, was not either the president or a director of the corporation, and that he was not guilty of any fraud, and took no undue or any advantage of Williams in the premises.

We decline to discuss this question, for several reasons: (1) Because there was no issue upon this question presented by the answer. This might have been cured by a timely amendment, if there were any facts that would sustain it. (2) The record does not show that this point was made or relied upon in the court below. (3) There is no assignment of error which presents this point for the consideration of this court, and there is no "plain error not assigned" which would authorize this court to notice it. (Rule 11 of this court, 32 C. C. A. lxxxviii.) The necessity of having assignments of error filed before the appeal is taken, in order to authorize the examination of any question, is fully and clearly stated by this court in Lloyd v. Chapman, 35 C. C. A. 474, 93 Fed. 599. We adhere to the views therein expressed.

Appellants contend that the questions as to whether there were any trust or fiduciary relations existing between the parties, or any fraud, oppression, or unfairness on the part of the bank in any of the transactions, cannot be considered by this court, because the bill of complaint does not contain any averment which presents these questions; and, in this connection, they call the court's attention to the fact that the bill does not allege that the purchase by the bank of the outstanding titles was "wrongful, or in any way in violation of any trust; on the contrary, the bill charges that it was by Sanford's procurement." This point does not seem to have been raised in the court below, and is not specified as error in any of the numerous assignments made by appellants. But the learned counsel have so interwoven this objection into their arguments in discussing the merits that, in connection therewith and as a part thereof, we have deemed it proper to consider the questions in relation to the position taken by counsel that the appellees cannot recover herein in any event, except upon positive, direct, clear, and conclusive evidence of an express agreement between Sanford and Burr that the purchases were made by the bank for Sanford's benefit.

As to this position, we are of opinion, after a careful examination of all the numerous authorities cited by counsel, that the statute of frauds has no application to this case, and that it was not error to admit parol evidence in order to establish the facts in relation to the true character of the various transactions between the parties. The general rule is well settled in equity that a decree must conform to the bill, and be warranted by it, both in the relief and in the grounds of relief; that relief not embraced in the prayer of the bill cannot be decreed, nor can the relief asked for be granted upon grounds not disclosed by the bill. In the present case, the prayer of the bill is certainly broad enough to warrant a decree without any proof as to an express agreement. It is true that it is alleged in the bill that the titles and claims were procured by the bank for the benefit of Sanford. Upon the trial Sanford so testified, and the court so found. But it

does not by any means follow that the appellees would have no right to redeem in the event this court should conclude that there was no positive agreement between the parties to that effect. We do not understand that it is ever absolutely necessary to set forth in a pleading the legal conclusions to be drawn from the statement of the facts concerning any given transaction, or to anticipate the grounds of defense. The facts upon which the pleader relies should be stated in the bill in a clear, plain, and concise manner, without argument or averments as to the conclusions to be drawn therefrom. The bill of complaint in this case sets forth the essential facts as to all of the transactions between the parties concerning the loan made to Sanford by the bank, and the acquisition of the titles by the bank to the Marsh ranch as security therefor, as well as in relation to the purchase of the outstanding titles. If, therefore, regardless of the question whether there was an express agreement as to the purchase of the outstanding titles, the other facts stated in the bill, and proofs established at the trial, show that any trust or fiduciary relations existed between the parties by virtue of such transactions, the complainants would be entitled to relief, although the words "trust" or "fiduciary" or "unfairness" are not mentioned in the bill.

In Texas v. Hardenberg, 10 Wall. 68, 85, it was claimed by counsel that the defendant could not, under the pleadings, be held to account for the proceeds of certain bonds which came into his possession, because the bill only prayed for relief by injunction against his receiving payment of the bonds. Chief Justice Chase, after announcing the general rule "that no relief can be granted under the general prayer, except such as is agreeable to the case made by the bill," and referring to the principal object of the bill, said:

"It may be admitted that these allegations and interrogatories do not assert the right of the complainant to the proceeds with absolute directness, and distinctness. The bill might have been better drawn. But we think it would savor of extreme technicality to refuse to see in the bill enough in relation to the proceeds of the bonds to warrant relief in this respect under the general prayer."

In Crawford v. Moore (C. C.) 28 Fed. 824, 827, the principles contended for by the respondents were similar to those urged here. It was there argued that the complainants had failed to make out the case stated in their bill, which was claimed to rest alone upon the averments of a trust, and that, inasmuch as the proofs at the trial negatived these averments, the suit should be dismissed for want of any averments in the bill to support the case attempted to be made by the evidence. The court said:

"The rule that the proof and the pleadings must correspond is a familiar one, but it is to be applied equitably, and not rigidly, especially when it is appealed to on behalf of a party having, all the time of the progress of the cause, the facts in full possession, and therefore not misled by a pleading which, although inaccurate or mistaken as to some of the details, yet contains averments sufficient to support a claim for the relief prayed for."

The decree in this case was affirmed by the supreme court in Moore v. Crawford, 130 U. S. 122, 142, 9 Sup. Ct. 447.

From the views we take of this case, there will be no necessity for

any separate discussion of the rights acquired by the bank under the different interests in the ranch, to wit, $^{91}/_{100}$ and $^{9}/_{100}$.

Counsel for appellants do not deny the general proposition that, when the title to property is taken in the name of one person and the consideration is paid by another, a resulting trust arises in favor of the person who paid the consideration. Their contention is that the bank never agreed to buy in the outstanding titles for the benefit of Sanford; that the case stands precisely in the condition of an ordinary mortgage given as a mere security; that, as a mortgagee out of possession, the bank had the right to buy in the outstanding titles for its own benefit; that the purchase by it of such incumbrances is unfettered by any inhibition which exists against purchases by active trustees and parties standing in fiduciary relations. Their position is clearly, tersely, and correctly stated in their brief. After making a synopsis of the pleadings, they say:

"From the foregoing it will be perceived that the defense does not rest upon any assertion of right under the redemption of July 28, 1875, for the defendants admit that whatever transfers the Savings & Loan Society received by virtue of that transaction were as security for the loan of $150,000; the only controversy in that regard being as to whether said loan was made to Sanford, as alleged in the bill, or to George S. Bowdoin, as averred in the answer, which is immaterial, except in so far as it has a bearing upon the question of the right of the society to acquire the subsequent titles for its own interests. The defense rests upon the titles subsequently acquired, the main controversy being as to whether, as a matter of fact, such titles were acquired as further security for said loan, and for the benefit of Sanford, as asserted by the bill, or independently of him, and for the sole interest of the Savings & Loan Society, as stated in the answer."

The arguments of counsel upon both sides were made in a double capacity: (1) Upon the facts as claimed by them, and (2) upon the facts as contended for by the opposite party; their respective contentions being that upon either theory they are entitled to a decree.

With reference to the first question, the evidence clearly shows that the redemption was made in the name of Bowdoin for the benefit of Sanford. It shows, beyond question, that the loan of $150,000 made by the bank was procured by Sanford for his own benefit, and that the remaining sum of $121,923.27 necessary to complete the redemption was furnished by Sanford. Sanford testified that in March, 1875, Mr. Burr promised to loan him $130,000 on the ranch towards the redemption on the foreclosure sale; that after he went to New York the loan of $150,000 was obtained from the bank through his representative, Mr. Eaton. F. W. Eaton testified that, with the assistance of S. A. Sharp, he borrowed the $150,000 from the bank for Sanford. The report of the committee of directors on loan to Sanford, June 4, 1875, is as follows: "Report of committee on application No. ——: James T. Sanford, of N. Y., by Eaton, of S. F., $200,000. —— years, at p. ct. p. yr. Security: Note of S.'d, and deed of trust of Rancho Los Meganos. Dr. John Marsh, confirmee in Contra Costa Co., of 13,306 acres, rated as follows by Mr. Sinclair." Then, after giving the value of the land at $256,000, and a statement as to the condition and character of the land, it concludes as follows: "Hence I cannot doubt that there is ample security for a loan of $150,000,

and recommend it. E. F. Northam, Com'r." In the minutes of the board of directors of the bank, June 4, 1875, the following entry was made: "The committee, on the application by Mr. Sanford for a loan on the Marsh Ranch, recommended a loan of $150,000. On motion, the report was received, and recommendation adopted." Cyrus W. Carmany, cashier of the bank, after reading this entry, testified that:

"The Mr. Sanford there referred to is James T. Sanford, complainant in this suit. * * * The application entertained on June 4, 1875, for the loan of $150,000, was the application of Mr. Sanford, as shown in the entry in the minutes which has been read. * * * The $150,000 referred to in that application is the same $150,000 to which I have referred in speaking of the moneys advanced towards the redemption from the Marsh foreclosure. * * * It was by the direction of Mr. Burr that the loan of $150,000 made to Mr. Sanford, as mentioned in the entry of the minutes on June 4, 1875, was entered in our books under the title of loan 5714, in the name of G. S. Bowdoin. * * * Q. Have you always treated with Sanford in reference to that transaction as his loan? A. Yes, sir. Q. And has not that been the case, Mr. Carmany, from the time of the return of Sanford to the state in 1875 or 1876, that the loan was treated as his loan? A. As Sanford's loan? Yes, sir."

Mr. Bowdoin, in reply to questions upon this point, answered as follows:

"Q. In whose name was the property redeemed? A. It was redeemed in my name. Q. Did you furnish the money with which the redemption was made? A. I did not. Q. Did you borrow the money for the purpose of making the redemption? A. I did not. * * * Q. Did you authorize the borrowing of any money from the Savings & Loan Society for the purpose of making this redemption? A. I did not in any way, shape, or manner. Q. Did you authorize the borrowing of any money from any person or corporation for the purpose of making this redemption? A. I did not."

Upon his cross-examination he answered as follows:

"Q. How, then, are we to understand your statement that you did not furnish the money with which the redemption was made? A. I was informed by my attorney, Mr. Lyon, that if I would authorize the redemption of the property Mr. Sanford would in some way or other furnish the requisite amount of money, and that it was for my interest to do so, as, in the event of Mr. Sanford's making anything more out of the property, it would inure to the benefit of those I represented."

The record shows that Mr. Burr knew all about the loan. He knew that Sanford was the person who procured the loan from the bank, and that the loan was obtained for the express purpose of making the redemption. He had several conversations with Sanford in relation thereto. He knew that the property was examined by some of the directors of the bank, and by a commissioner, to ascertain its condition and report its value. He had himself visited the premises with that object in view. He did not know Bowdoin, and had never conversed with him upon the subject. His testimony to the effect that the bank, in the matter of the loan for the purpose of redemption, was dealing with Bowdoin, while true in a limited sense, falls far short of explaining the whole story. The fact is, and Burr knew it, that Bowdoin's name was merely used in the transactions for the purpose of transmitting the title to the bank for the benefit of Sanford. It would be useless to quote or refer to any further testimony upon this point, or any testimony relative to the balance of the money

97 F.—45

having been furnished by Sanford. It is enough to say that the testimony upon both these points is conclusive.

The testimony as to whether the bank, through Sanford, procured the subsequent titles, as alleged in the bill of complaint, for the purpose of protecting its title to the property, and for no other purpose, or whether these outstanding titles or claims were bought by the bank in open hostility to Sanford, as alleged in the answer, is in many respects conflicting. The court below, without any review of the testimony, expressed the opinion that the preponderance of the testimony was in favor of complainants' contention. Preliminary to any discussion of the testimony upon this point, it is urged by appellees that the conclusions arrived at by the circuit court should prevail, unless the record clearly shows that the evidence unmistakably establishes the contrary. The consensus of the opinions of the judges of the court of appeals in the various circuits is to the effect that, in determining this question, the findings and decree of the circuit court must be taken as presumptively correct, and, unless it clearly appears from the record that some mistake has been made in the consideration of the evidence, the decree should not be disturbed. Such was the expression of this court in Tate v. Holmes, 22 C. C. A. 466, 76 Fed. 664, 667.

Substantially the same views have been frequently announced by the supreme court. A review of the authorities is unnecessary, because the contention of appellants is that the conclusion of the circuit court upon the evidence is plainly and manifestly erroneous, and that the great weight of the evidence clearly preponderates in favor of the views for which they contend, and, in support of their contention, it is claimed that the testimony on behalf of the appellees rests solely upon the testimony of one witness (Sanford), and it therefore invokes the rule, frequently announced in equity, that, complainants having required and obtained an answer under oath, they must overcome such answer by the satisfactory testimony of two witnesses, or of one witness and such corroborating circumstances as are equivalent to the testimony of another witness. But this rule can only be relied upon where there is a direct, positive, and unequivocal denial in the answer of the allegations in the bill which the defendants are called upon to answer. It does not apply to allegations in an answer made solely upon information or belief, nor to averments made without knowledge of the facts, for the mere purpose of compelling the complainants to make some proof in regard thereto. Blair v. Silver Peak Mines (C. C.) 93 Fed. 332, 334; Earle v. Publishing Co. (C. C.) 95 Fed. 544, 548; Reigel v. Insurance Co., 153 Pa. St. 134, 143, 25 Atl. 1070.

Going back to the early cases, we find certain principles which are necessary to be observed in the application of the rule to the present case.

In Clarke's Ex'rs v. Van Riemsdyk, 9 Cranch, 153, 160, the court said:

"The general rule that either two witnesses, or one witness, with probable circumstances, will be required to outweigh an answer asserting a fact responsively to a bill, is admitted. The reason upon which the rule stands is this:

The plaintiff calls upon the defendant to answer an allegation he makes, and thereby admits the answer to be evidence. If it is testimony, it is equal to the testimony of any other witness; and, as the plaintiff cannot prevail if the balance of proof be not in his favor, he must have circumstances in addition to his single witness, in order to turn the balance. But certainly there may be evidence arising from circumstances stronger than the testimony of any single witness. The weight of an answer must also, from the nature of evidence, depend, in some degree, on the fact stated. If a defendant asserts a fact which is not and cannot be within his own knowledge, the nature of his testimony cannot be changed by the positiveness of his assertion. The strength of his belief may have betrayed him into a mode of expression of which he was not fully apprised."

In Carpenter v. Insurance Co., 4 How. 185, 218, the court said:

"Where an answer is responsive to a bill, and, like this, denies a fact unequivocally and under oath, it must in most cases be proved, not only by the testimony of one witness, so as to neutralize that denial and oath, but by some additional evidence, in order to turn the scale for the plaintiff. * * * The additional evidence must be a second witness or very strong circumstances."

The issue involved in the present case does not rest alone upon the testimony of Sanford. There are other witnesses and innumerable circumstances in addition to his positive testimony that tend directly to sustain the contention of appellees. These circumstances amount to more than the testimony of any single witness. Upon this point alone the facts are sufficient to take the case out of the rule; or, more properly speaking, the appellees have brought the case within the rule, and have overcome the weight which should be given to the averments in the answer, by producing one witness, and circumstances, exhibits, and facts more than the equivalent of another witness. But there are other, and perhaps stronger, reasons why the rule sought to be applied cannot be held controlling in the present case. The verification to the answer upon the part of the bank was made by Carmany, who was its cashier. It was verified by Burr, Mearns, and Drown, for themselves. When an affidavit is made on behalf of a corporation, it does not necessarily follow that all the allegations contained in the answer are within the knowledge of the individual person who makes the affidavit.

In Story, Eq. Pl. § 849a, note b, it is said that:

"An answer upon oath is not evidence for the defendant, which must be overcome by two witnesses, in the following cases: * * * (5) When the answer itself shows, or it is apparent from the defendant's situation or condition, that, though the answer is positive, he swears to matters of which he could not have personal knowledge."

See, also, Berry v. Sawyer (C. C.) 19 Fed. 287, 290; Garrow v. Carpenter, 1 Port. (Ala.) 359, 373; Adams, Eq. 363; 1 Enc. Pl. & Prac. 947, and authorities there cited.

The testimony of Mr. Carmany clearly shows that he had no personal knowledge of many of the transactions which Sanford testifies occurred between himself and Mr. Burr, the president, and Mr. Drown, the attorney, of the bank. In the very nature of his position as cashier, his knowledge is confined and limited to such matters as the entries in the bank's books and minutes of the board of directors would show, and in his testimony he states that most of the transactions were conducted by Mr. Burr, and that the busi-

ness was of such a character as came within the official duties of the president of the bank to transact. Among other things, he said:

"While president of the bank, Mr. Burr was in the habit of taking all the applications for loans, and, whenever there was any consultation with regard to the business of the bank, he attended to it. * * * He directed the business of the bank. * * * You might say that, substantially, Mr. Burr ran the bank while he was president. * * * I personally took no part in or about the negotiations of that loan ($150,000 loan to Sanford), or anything connected with it. * * * Those are matters which Mr. Burr determined. * * * He was the one who governed and directed with regard to that. It was by the direction of Mr. Burr that the loan of $150,000 made to Mr. Sanford, as mentioned in the entry of the minutes of June 4, 1875, was entered in our books under the title of loan 5,714, in the name of G. S. Bowdoin."

Speaking of the entries made in the books concerning the amounts paid by the bank in the purchase of the outstanding titles, this witness said:

"With reference to various items of money paid, concerning which I have spoken in my testimony, I speak from the entries appearing in our books and the vouchers introduced in evidence. I, personally, did not give any directions in regard to any payments. Those were directed by the president. The negotiations of the transactions themselves were all conducted by Mr. Burr, and I attended to the payments, and to the making of the entries in the books, in accordance with his directions. Personally, I took no part in the negotiations myself."

Moreover, appellants did not rely upon their answer. Carmany, Burr, and Drown went upon the witness stand, and were sworn and examined in regard to the various transactions. It is earnestly argued by appellees that the testimony of these witnesses, when properly digested, analyzed by judicial tests, and weighed by legal scales, amounts to a denial of the averments in the answer. It is undoubtedly true that an answer may be overcome by the testimony of the witness who verified it, or by the testimony of the other defendants testifying in their own behalf or on behalf of the other defendants.

In Morris v. White, 36 N. J. Eq. 324, 329, the court said:

"The rule applies where the reason for it is found. The reason for the adoption of this rule by courts of equity is because, there being a single deposition only against the oath of the defendant in his answer, the denial of facts in the answer is equally strong with the affirmation of them by the deposition. * * * This rule has been referred to the equitable principle on which it is grounded, namely, the equal right to credit which a defendant may claim when his oath, positively, clearly, and precisely given, and consequently subjecting him to the penalty of perjury, is opposed to the oath of a single witness. But, when the witness who opposes the answer is the defendant himself, the reason of the rule fails."

Much of the evidence given by Sanford is positively denied by Burr and Drown in their examination in chief. Among other things, Burr testified that all the negotiations and purchases of the outstanding titles were kept quiet as a matter of policy, and so managed that Sanford had no knowledge of the transactions; that the purchases were all made in hostility to Sanford. While denying the truth of many of the statements made by Burr, appellees confidently assert that "the admissions of Mr. Burr, distinctly made upon the stand, are sufficient to establish the truth of Mr. Sanford's testimony

in that behalf." Especial stress is laid upon the proposition that, conceding the facts to be as claimed by appellants, that the bank bought in the outstanding titles without any express agreement with Sanford that he should have any benefit therefrom, and that all the purchases were really made in hostility to him, it is manifest from the testimony of Mr. Burr that he allowed Sanford to believe that the bank was making these purchases under some arrangement with him. If this be true, it adds a strong link in the chain of evidence, which tends to show that in whatever relation the bank may finally be placed by the court, whether as a trustee or a mortgagee, it was not at all times acting "in good faith" towards Sanford. In the consideration of Burr's testimony upon this point, it must constantly be kept in mind that he knew that in making the loan of $150,000 he was dealing with Sanford in the name of Bowdoin. In the light of this situation, we will examine his testimony in relation to the purchases of the outstanding titles and claims against Sanford.

In weighing the testimony, we have not overlooked the fact of the deep personal interest of both sides. It may be presumed that the principal witnesses were naturally inclined to tell their story most favorably to themselves. A little coloring, here and there, is liable to convey different impressions, sometimes false ones, and it requires much time, deliberate thought, and careful consideration upon the part of the court, as well as of counsel, to discover the truth, which is the object, end, and aim of all judicial investigations. Most of the evidence contained in the voluminous record centers around the testimony of Sanford upon one side and Burr upon the other. The testimony of Mr. Burr is in many respects supported by the testimony of Mr. Drown, who was the attorney for the bank. They both declare, in positive terms, that there was never any agreement between them or the bank with Sanford that the outstanding claims and titles were procured at the request of, or for the benefit of, Sanford. But, while their testimony is positive in that direction, it appears very clearly that their conduct and action was such as to lead Mr. Sanford to believe that they were acting for him, for the purpose of protecting his interests as well as their own. Although claiming to have bought the titles in hostility to Sanford, a careful perusal of the whole testimony unmistakably shows that they scrupulously withheld from Sanford any information that such was their object and purpose. The facts in this regard are permeated throughout the entire record of Burr's testimony, and can only be gleaned, with entire satisfaction, from the perusal of the whole thereof. A statement in narrative form would be inadequate to convey the full force and effect of his testimony. It requires the questions as well as the answers. A brief quotation must, however, suffice for the purposes of this opinion. In answer to questions upon his cross examination, Burr testified as follows:

"Q. I again ask you if the truth, in fact, concerning these payments, be not that they were thus paid by the bank because of, and in accordance with, an understanding had with Mr. Sanford on the subject. A. Not at all; but hostile to Mr. Sanford,—in opposition to Mr. Sanford entirely; all about that

time, for about six or seven months, the negotiations were without his knowledge. Q. Do you mean to say that you were then at war with Mr. Sanford? A. No; I mean to say that Mr. Sanford had fiddled around, and had so many projects where he was going to do great things that he never did, that the bank had got tired of having any talks with him. He came in there all the time, and always had some new project—some new plan—that he had seen that would relieve him, and put him back the. owner of that ranch. Q. Well, seemingly, however, he had some plan to get you to pay these debts? A. Yes, sir. Q. And you did pay them? A. Yes, sir. * * * Q. I will ask you if the moneys paid to Lord in settlement, as appears by the papers in evidence here, were not paid merely for the purpose of getting possession of the property, which the bank could have easily secured through a writ of assistance from the court in which the mortgage was foreclosed, but because there was an understanding, or an informal talk, as you call it, between yourself and Mr. Sanford, according to which Lord was to be settled with, and the moneys paid in such settlement, upon final settlement of the $150,000, should be reimbursed to the bank. A. I don't remember any understanding with Mr. Sanford, or any settlement with Mr. Lord, except as is in this paper, a copy of which appears in the testimony of Mr. Carmany. Q. Do you undertake to deny that there was such informal understanding between you and Mr. Sanford? A. I don't deny it, but I don't remember of it. * * * Q. Mr. Burr, have you any doubt that the bank was not getting anything from the Marsh ranch, either by way of interest, or by way of rent, or in any other way, from the time payment of interest stopped on the Bowdoin loan up to the 14th of December, 1878? * * * A. If that was the fact, I have no recollection of it that it was the fact or that it was not the fact. Q. Well, now, Mr. Burr, isn't it a little strange that you would not have some recollection of a matter like that? A. No; for this reason: the bank felt perfectly secure in this loan, that it was accumulating satisfactorily, and there was no apprehension to cause them to be disturbed. If anything came in, they took it, and, if it didn't, they did not. * * * The security was so abundant that there was no uneasiness felt about it. * * *"

During his examination Burr was shown complainants' Exhibit Q, which was an agreement between one Grumauer, of the first part, and Sanford, of the second part, relative to the sale by Sanford of two lots to Grumauer in Brentwood, dated October 16, 1878, wherein G. agreed to "deliver at the office of the Savings & Loan Society in San Francisco, for the use and benefit of the party of the second part [Sanford], the principal sum of $250," at certain times. Indorsed upon the back of this agreement is, "$50, rec'd Oct. 16, 1878, fifty dollars. E. W. Burr." Mr. Burr acknowledged the receipt of this money.

"Q. Didn't you receive it on the purchase price of the property described in that document? A. I could not go back that far, and say. * * * Q. Mr. Burr, evidently Mr. Sanford was in communication with you in connection with the property? A. Mr. Sanford was then on the ranch, and we were preparing to move on his works, and the next month we did. Q. Do you mean to say, Mr. Burr, that while you were were holding friendly relations with Mr. Sanford, and communicating with him in respect to the disposition of this property, as this document Exhibit Q would imply, you were secretly maturing some scheme by which he would be swept out of all his rights in the property? A. No, sir; we were quietly proceeding to get Mr. Lord and Mr. Eaton out of the way, without consulting Mr. Sanford, and in a few days it was consummated, and then these payments were made. Q. Do you mean to say that these proceedings were hostile to Mr. Sanford, and that he so understood it? A. I mean to say that they were hostile, and were done without his knowledge. Q. That is, while you were in friendly treaty with him, you were quietly maturing and carrying out a plan under which he would be stripped of all his rights in the property,—is that it? A. We were under no treaty with him, or under no arrangement. * * * Q. You gave him no reason to be-

lieve that you were acting in any way hostile to his interest, did you? A. We had no reason to do that. Q. Well, as a matter of fact, you didn't do so? A. No, sir; as a matter of fact, we did not do it. Q. You never did or said anything to him to let him believe that you were acting in hostility to his interests, did you, Mr. Burr? A. I had no occasion to. Q. Well, I don't ask you about 'any occasion to.' I ask you about facts. A. Well, I had nothing to do with it, and it wasn't in my hands. * * * Q. You never said or did anything to let Mr. Sanford believe or think that you were doing anything hostile to his interests, did you? A. I didn't consider he had any interest."

With reference to the laying out and platting the town of Brentwood:

"Q. Didn't Mr. Sanford employ, and did not you pay for, the surveyor for laying it out? A. Yes, sir; paid the surveyor, but I don't know who employed him. Q. Wasn't it Mr. Sanford who employed him? A. I don't know. We did not pay Mr. Sanford; we paid the surveyor. Q. Didn't you pay him on the order of Mr. Sanford? A. I don't know; you will have to find that out. * * * Q. Mr. Burr, in speaking of what took place about the settlement with Lord and with Eaton, you say that it was all conducted quietly, and without the knowledge of Mr. Sanford, and I would like to know what was the occasion of withholding knowledge of it from Mr. Sanford. A. It was in the hands of Mr. Drown, and he advised that I should not make any communication to Mr. Sanford about it; it did not concern him at all. Q. You say that about that time, for about six or seven months, the negotiations were without his knowledge, and elsewhere you say that we kept quiet 'as a matter of policy'; what was the policy to be subserved, or what was the occasion of keeping it from Mr. Sanford? A. To avoid any more obstructions in the obtaining of the quiet possession of the property. Q. How did you apprehend that Mr. Sanford could throw any obstacles in the way of the bank getting possession, if he had desired? A. Well, he might have made common cause with Mr. Eaton and Mr. Lord. As Mr. Lord was in possession, he might have made us a great deal of difficulty. Q. You at that time, Mr. Burr, held the sheriff's deed under the decree of foreclosure, to which Mr. Sanford was a party, and on application to that court, under the terms of its decree, as well as the well-settled rules of law, could have been placed in possession on summary application. How, then, could Mr. Sanford have made any trouble or interposed any obstacle to the bank getting possession of the property, assuming that there were no arrangements between the bank and Mr. Sanford touching the possession of the property? A. The bank was quietly waiting and hoping for a year that Mr. Sanford, through some of the various projects that he had inflated, would be enabled to benefit himself, and pay the bank its debt, and be restored to the possession. Failing in that, he moved his family up on the ranch, and talked about negotiating for the possession, and we did not negotiate."

Mr. Drown, in reply to the question, "From the time that your connection with this business began, down to the time of the assignment by Richardson, Hill & Co., to what extent did you advise with Mr. Sanford in regard to what was being done?" said:

"The things that were done, whenever Mr. Sanford made any inquiry of me about them, I told him the truth about them. I did not confer with him at all about the negotiations with Mr. Eaton. They were taken wholly independent of Mr. Sanford, and, so far as I knew, without his knowledge. He was in the city here a good deal, and came to the bank occasionally, and met me sometimes, and whenever he asked me about any matter, as far as I told him, I told him just as it happened. I did not, however, confer with him to any extent."

The weight of the circumstances attending the transactions is, in our opinion, decidedly in favor of the position contended for by appellees. It is true that there are some circumstances that tend the other way. It is seldom an easy task to follow men in their daily thoughts and business affairs for so many years, and in such

varied transactions, and find their expressions and conduct absolutely free from controversy. When men disagree as to their understanding and intention in regard to certain business transactions, it is usually the case that many things have occurred which tend, in a greater or less degree, to support both sides of the controversy.

We have made these extended references to the pleadings, the contentions of the respective parties, and the evidence in regard thereto because the case, as conceded by both parties, virtually rests upon the conclusions reached as to the facts. We shall now proceed to state our views with reference to the legal and equitable principles, which have been elaborately and thoroughly discussed by counsel. The redemption having been made by Bowdoin with money which Sanford procured and furnished, and the bank having acquired the title for the benefit of Sanford with knowledge that he, instead of Bowdoin, was the real party in interest in said transaction, it follows, as a matter of law, that by that redemption and the delivery of the sheriff's deed to the bank, or to its officers for the bank, there was vested in the bank the legal title in trust for Sanford, subject only to a lien in favor of the bank to secure it for the repayment of the money it had loaned and advanced, and upon the repayment of this money it would become the duty of the bank to convey the property to Sanford.

The law in California is well settled that if title to land is taken in the name of A., and the purchase money is paid by B., the title is held by A. upon a resulting trust in favor of B. Hidden v. Jordan, 21 Cal. 92, 99; Millard v. Hathaway, 27 Cal. 119, 139; Sandfoss v. Jones, 35 Cal. 481, 489; Hellman v. Messmer, 75 Cal. 166, 169, 16 Pac. 766; Walton v. Karnes, 67 Cal. 255, 256, 7 Pac. 676; Campbell v. Freeman, 99 Cal. 546, 34 Pac. 113; Sayward v. Houghton, 119 Cal. 545, 549, 51 Pac. 853, and 52 Pac. 44.

Under the law of California, a trust may arise either by virtue of an express written agreement, or by operation of law. Civ. Code Cal. § 852. It will be observed that all the transactions between the parties hereto occurred after the adoption of this Code, which enacts the rule previously declared in Hidden v. Jordan and other cases decided by the supreme court before its adoption and adhered to in all of the subsequent cases.

Section 853 of the Code declares that:

"When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

In Campbell v. Freeman the court said:

"The rule is familiar that when, upon a purchase of real property, the purchase money is paid by one person, and the conveyance is made to another, a resulting trust immediately arises against the person to whom the land is conveyed, in favor of the one by whom the purchase money is paid. The real purchaser of the property is considered as the owner, with the right to control the title in the hands of the grantee, and to demand a conveyance from him at any time. The same rule prevails if the money paid by the party taking the title is advanced by him as a loan to the other, and the conveyance is made to the lender for the purpose of securing the loan. But in the latter case the purchaser cannot demand the conveyance until he has paid the money advanced and for which the land is held as security. In such a case, the grantee holds

a double relation to the real purchaser. He is his trustee of the legal title to the land, and his mortgagee for the money advanced for its purchase, and, as in the case of any other mortgage which is evidenced by an absolute deed, is entitled to retain the title until the payment of the claim for which it is held as security, and he may also enforce his lien by an action of foreclosure. * * * Equity looks beyond the form of a transaction, and shapes its judgments in such a way as to carry out the purposes of the parties to the agreement, and to protect each of them against any unconscionable advantage to be derived from the apparent form in which their transaction has taken place."

The bank, being a trustee for Sanford, could not, while holding that relation, buy in the outstanding titles and claims with the intent to deprive Sanford of his equitable estate and interest in the premises. Certainly not while secretly concealing from him its intention, and so acting as to induce him to believe that the titles and claims were purchased by the bank for his benefit. This is explicitly declared, not only by the provisions of the Civil Code, but by the decisions of the supreme court before and after its adoption. Page v. Naglee, 6 Cal. 241, 245; Price v. Reeves, 38 Cal. 457; Janes v. Throckmorton, 57 Cal. 368, 386; Cavagnaro v. Don, 63 Cal. 227, 231; Eversdon v. Mayhew, 65 Cal. 163, 166, 3 Pac. 641; Raynor v. Mintzer, 67 Cal. 159, 162, 7 Pac. 431; O'Connor v. Irvine, 74 Cal. 435, 439, 16 Pac. 236; Scrivner v. Dietz, 84 Cal. 295, 297, 24 Pac. 171; Wickersham v. Crittenden, 93 Cal. 17, 29, 28 Pac. 788.

The Code, in treating of the obligations and duties of trustees, among other things provides as follows:

"Sec. 2229. A trustee may not use or deal with the trust property for his own profit, or for any other purpose unconnected with the trust in any manner.

"Sec. 2230. Neither a trustee nor any of his agents may take part in any transaction concerning the trust in which he or any one for whom he acts as agent has an interest, present or contingent, adverse to that of his beneficiary, except as follows: (1) When the beneficiary, having capacity to contract, with a full knowledge of the motives of the trustee, and of all other facts concerning the transaction which might affect his own decision, and without the use of any influence on the part of the trustee, permits him to do so. * * *"

"Sec. 2234. Every violation of the provisions of the preceding sections of this article is a fraud against the beneficiary of a trust."

We are well aware that there are numerous kinds of trusts, and that distinctions are constantly being drawn in cases where the trustee may or may not acquire an adverse title in his own behalf. Counsel for appellants have cited from 2 Perry, Trusts, §§ 520, 521, and from Pom. Eq. Jur. §§ 162, 163, 368, 374–376, 957, 958. to show that, where the trust is a purely passive one, the disability as to the acquisition of other titles does not arise. This would be so in cases where the trustee of an express, passive trust has no duty to perform, except to convey to a designated person a specified title. Why? Because the acquisition by him of such other title does not, in any way, shape, form, or manner, contravene his duty. It does not prevent the complete performance of his trust. In such cases the trustee has not obtained by the transaction any power over his beneficiary, and hence the beneficiary of the trust is not placed under any disadvantage. There are cases of express trust in which no disability exists against the trustees, and there are cases of constructive trusts in which the disability exists.

In the consideration of this case, we shall not attempt to discuss the different kinds of trusts created by statute, express agreements, or by operation of law, but will endeavor to confine ourselves to the particular relations existing between the bank, Burr, and Drown upon the one side, and Sanford upon the other. Whatever Burr and Drown did, and whatever conveyances they received, were for the bank, and hence the relation to which we refer exists solely between the bank and Sanford. The question, therefore, is whether the bank was under any binding obligation in equity to abstain from purchasing any titles to the Marsh ranch in hostility to Sanford, because such acts would be in direct violation of its duty to execute the trust created by the transactions between the parties.

The legal title was invested in the bank. Sanford had no .written agreement as to the trust. Does not the law declare that confidence in such cases is imposed upon the trustee holding the title? Was the bank not bound to return the property to Sanford upon the payment of the money due, free and unimpaired from any hostile acts on its part? Sanford was at the mercy of the bank. He relied upon the bank to stay with him, and, above and beyond this, to act openly, honestly, and fairly with him. He was placed in such a position that he had to rely upon his trustee. But whether there was any absolute confidence reposed may, to a certain extent, be immaterial upon this branch of the case, because, in any event, as is shown by a mere recital of the facts, it is apparent that the purchases made by the bank in alleged hostility to Sanford were made in direct contravention of its duty to execute its trust.

Illustrative of the cases where the transactions between the parties have been held to be a trust, and in support of the views we have expressed, we quote from two of the cases previously cited.

In Raynor v. Mintzer there was only a constructive trust. Raynor was the owner of four-sevenths of certain real property. By certain transactions claimed to be fraudulent, the defendants, who were his co-tenants, obtained a conveyance from him of his interest in the property, and thereby became vested with the legal title to the whole. The trial court decreed, upon the facts, that they should convey the property which they had received by the conveyance to Raynor upon the payment by him of the amounts of money which they had expended thereon. From this decree the defendants appealed. After the appeal was taken, they induced the creditors of Raynor to bring suit, which they did, and obtained judgments, advertised the property, and one of them bought the property, and assigned his interest to the defendants, who had in the meantime organized themselves into a corporation. Judgment in the original case of Colton Land & Water Company against Raynor having been affirmed, the defendants contended that they were entitled to hold the property under the title which they had acquired from the purchaser at the sheriff's sale, because they bought the same in hostility to Raynor, and were not his trustees. Upon these facts the court said:

"When title to real property has been acquired by fraud, the true owner is entitled to be relieved against the fraud, and to be reinvested with his owner-

ship, upon such terms as may be just. The terms upon which the relief was granted were just. By its decree the court undid the wrong which had been done, and left all the parties to the transaction in possession of their legal rights as they were before the assignment of the certificate of purchase. Raynor was restored to his original position as a tenant in common with his co-tenants in the property, upon paying to them the moneys which they had paid to Clyde for his interest in the property. Upon receiving that money, they had no longer any right in his property which they could in conscience retain; for it is conceded that, originally, Raynor was a tenant in common with them in the property, and when they assumed the exclusive possession of it under the transactions with him and the instruments in writing executed by him, adjudicated in the case of the Colton Land & Water Company against Raynor, they held the apparent legal title to his interest in the common property in trust for him. This title, whether held by him or by them in trust for him, vested him with the right to his share in the property, and in the proceeds derived from it, under the arrangement between the tenants in common as to the management and disposition of the property, as adjudged in that case. The fact that the co-tenants, in exclusive possession, cloaked themselves in the garb of a corporation, and conveyed the property to themselves in the corporate name, did not devest Raynor of his rights. His co-tenants were still, in the shape which they saw fit to assume, the trustees of his legal title; and that fiduciary relation continued to exist, binding them, in all their transactions with the property, to the observance and practice of good faith to their co-tenant and cestui que trust. From the obligations of that relation they could not relieve themselves by any transfer of the property to themselves in the name of a corporation into which they changed themselves, nor by a transfer to any other person who knew of the existing relation, nor by indirect and crooked attempts to acquire the trust property for themselves. Nor did the judgment of the court in the case of the Colton Land & Water Company against Raynor relieve them from their trust as to the plaintiff's title. That judgment established the trust, and decreed its performance; but before performance, and while proceedings were pending to revise the decree itself, they attempted to avoid performance by the acquisition of the trust property to themselves by means of the judgment and execution sale. Against such proceedings the plaintiff was entitled, upon every principle of equity, to be relieved."

### In O'Connor v. Irvine the court said:

"The evidence shows that the defendant acted as the agent of Fair and Selover in purchasing the property and in holding it, and that he so considered himself up to a certain period, when, having had some misunderstanding with Fair, he resolved to assume the right of ownership in the property. Fair furnished the money with which the purchase was made. It was not necessary for the plaintiff to show the defendant agreed, in formal or express language, that he would make the purchase for Fair and others, and hold it for their benefit. It is sufficient if it was mutually understood between the parties that he was so acting in their behalf. What was said and done by the parties, so far as the evidence shows, is capable of only one interpretation, and establishes a perfect understanding between the parties, as above stated. Under such circumstances, although the language used may not of itself show an express promise, it is the duty of the party whose services are sought, if he does not mean to act in accordance with the evident expectation of the parties with whom he is dealing, to expressly declare that he will not; otherwise, his silent acquiescence is a fraud. * * * The evidence shows that defendant rendered an account for the money advanced, and received the amount thereof, prior to the execution and delivery of the sheriff's deed. It would appear, therefore, that he ought not now to be heard to say that it was not a loan, and, if it was a loan, the facts created a resulting trust."

The views we have expressed are conclusive of the case upon its merits; but we are of opinion that the same result would necessarily follow if the transactions between Sanford and the bank should be treated only as a mortgage. Speaking generally, with reference

to an ordinary mortgage, where there is no trust relation between the mortgagor and the mortgagee, the mortgagee does not owe the mortgagor any duty to protect the equity of redemption, because there is no relation created between them analogous to that of trustee and cestui que trust by the mere execution and delivery of the mortgage. In all cases of this character, where there is no fraud, unfairness, or undue advantage taken of the mortgagor, the mortgagee is not prevented, by any rule or principle of law or equity, from buying in any outstanding claims or titles to the property, and holding the same adversely to the mortgagor. In such cases, as was said in De Martin v. Phelan (C. C.) 47 Fed. 761, 763:

"The mortgagee can at all times deal with the mortgagor in respect to the property mortgaged precisely upon the same footing as any other person, and may purchase liens or claims against the property for less than their face value, and hold them against the mortgagor for the full amount."

The principles enunciated in that case are well settled and supported by authorities in nearly every state in the Union, and in England. But it will be noticed, by a careful reading of that opinion, that special pains were taken to show that, in the transactions which there took place, there was no fraud, "unfair, or grossly oppressive advantage of complainant's necessities," or any "undue or improper influence" on the part of the defendant.

The case of Harrison v. Roberts (decided in 1856) 6 Fla. 711, 714, which appears to have been selected by appellants as the strongest case in their favor, is simply an authority in favor of the rule announced in De Martin v. Phelan, supra. It was evidently cited for the purpose of calling our attention to the expression used by the court that, "in such case, there is no room for oppression or opportunity for taking advantage of the necessities of the mortgagor." An examination of the facts in that case clearly shows that there was no oppression, and, if there was any opportunity for taking any advantage of the necessities of the mortgagor, the defendants did not avail themselves of the opportunity. Whether there is "any room" for such action in any case can be best determined by an examination of the peculiar facts of each particular case. It is enough here to say that in all of the numerous authorities cited by appellants, as well as those cited by the appellees, where there is any discussion upon this point, it is held that in such transactions there must be no unfairness on the part of the mortgagee.

The right of redemption is a favored right in equity. Courts always view with jealousy and suspicion any dealing between the mortgagor and mortgagee to extinguish the equity of redemption. The mere fact of this relation, independent of any trust, in transactions of this character, induces the courts to guard with zealous care the rights of the mortgagor, and tends to shed light upon the question whether there has been any unfairness, oppression, or undue advantage, especially where there is a gross inadequacy of price and other circumstances tending to show any fraud. It is only in cases where the transactions are fair and honest, without fraud, and where no unconscionable or undue advantage has been

taken of the mortgagor's position by the mortgagee, that the purchase of outstanding titles by the mortgagee can be upheld and sustained. Russell v. Southard, 12 How. 139, 148; Villa v. Rodriguez, 12 Wall. 323, 339; Peugh v. Davis, 96 U. S. 332, 337; Brick v. Brick, 98 U. S. 514, 516; Oliver v. Cunningham (C. C.) 7 Fed. 689, 694; Chapman v. Mull, 42 N. C. 292, 295; Remsen v. Hay, 2 Edw. Ch. 535, 542; Shaw v. Walbridge, 33 Ohio St. 1, 6; Walker v. President, etc., 6 Del. Ch. 81, 91, 10 Atl. 94; Moore v. Titman, 44 Ill. 367, 371; Seymour v. Mackay, 126 Ill. 341, 352, 18 N. E. 552; Hinkley v. Wheelwright, 29 Md. 347, 349; Tant v. Guess, 37 S. C. 489, 499, 16 S. E. 472; Perkins v. Drye, 3 Dana, 170, 177; Stoutz v. Rouse, 84 Ala. 309, 311, 4 South. 170; Peagler v. Stabler, 91 Ala. 309, 9 South. 157; Jones, Mortg. § 711.

In Villa v. Rodriguez the court said:

"The law upon the subject of the right to redeem, where the mortgagor has conveyed to the mortgagee the equity of redemption, is well settled. It is characterized by a jealous and salutary policy. Principles almost as stern are applied as those which govern where a sale by a cestui que trust to his trustee is drawn in question. To give validity to such a sale by a mortgagor, it must be shown that the conduct of the mortgagee was, in all things, fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him. Where confidential relations and the means of oppression exist, the scrutiny is severer than in cases of a different character. The form of the instruments employed is immaterial. That the mortgagor knowingly surrendered, and never intended to reclaim, is of no consequence. If there is vice in the transaction, the law, while it will secure to the mortgagee his debt, with interest, will compel him to give back that which he has taken with unclean hands. Public policy, sound morals, and the protection due to those whose property is thus involved, require that such should be the law."

In the light of all the facts, transactions, circumstances, and surroundings in the present case, it cannot be said that no advantage was taken of the condition of the mortgagor, or that the purchases were made in such an open, frank, and fair manner as to deprive Sanford of his right to maintain this suit.

The suit, as before stated, can be maintained independent of the question whether there was any direct agreement between the parties that the purchases should be made for Sanford's benefit, not only upon the ground that the bank was the trustee of a trust resulting from the original transaction,—the payment of the purchase money by Sanford, and the acquisition by the bank of the apparent title to the property,—but also upon the ground that the bank, if treated as a mortgagee, was incapacitated from purchasing the outstanding titles for itself, because it withheld from Sanford the fact that it was purchasing the same in hostility to him, and, on account of their previous existing relations, induced him to believe that it was, in these transactions, acting in his interest, and thereby obtained an undue and unfair advantage.

Finally, it is claimed that the court erred in refusing in its final decree to allow the bank credit for all the taxes paid by it upon the property involved herein, since the adoption of the present constitution of California. The master to whom the case was referred for

the purpose of taking an account held that the interest of the bank in the property was a mortgage, and should have been assessed as such, and that, under the provisions of sections 4 and 5 of article 13 of the constitution of the state of California, the bank was only entitled to be reimbursed for such proportion of the taxes paid by it as exceeded the amount of the tax which should have been levied on the value of its security. The court sustained the views expressed by the master. Sanford v. Society (C. C.) 80 Fed. 54, 57. Appellants contend that this ruling is erroneous, because no tax was levied upon the security. This contention cannot be maintained. The bank was liable, under the laws of California, for the amount of the tax on the value of its security. It was its duty, as the owner of the mortgage, to pay the tax to the extent of the value of its security. The owner of the property is required to pay the tax upon the excess. The fact upon this point, as reported by the master, is as follows:

"The mortgage interest of the Savings & Loan Society in the Los Meganos Rancho has never been separately assessed; but the Savings & Loan Society has from year to year had the entire property, except the lots sold in the town of Brentwood, assessed to itself as the owner thereof."

It is clear to our minds that, upon the facts of this case, the bank is not entitled to be reimbursed for the proportion of the tax it should have paid upon the security it held. It makes no difference whether the security held by the bank was a trust deed or a mortgage.

In Locke v. Moulton, 96 Cal. 21, 30, 30 Pac. 957, the court said:

"It was defendant Moulton's duty to have listed his land subject to the mortgage, while it was equally the duty of the plaintiff to have returned his mortgage security for taxation, and Mr. Moulton would have been liable only for the tax upon any excess of the assessed value of the land over the amount of the mortgage."

In Hibernia Savings & Loan Soc. v. Behnke, 121 Cal. 339, 343, 53 Pac. 812, which appellants' claim is conclusive in their favor, the owner of the property paid the entire tax, and sought to obtain a reduction in the judgment obtained in the foreclosure suit by the bank for the proportion of the tax that should have been, but was not, levied against the security. Upon those facts the court said:

"It is only the tax 'levied upon the security' that the owner may pay, and have the amount deducted from the amount of the security (Const. art. 13, § 4); and, as there was no assessment of the security, the defendant was not authorized to have this payment deducted."

It will be noticed that the facts in that case presented an entirely different question from the one involved in this case. The relations between the parties were not similar. There neither party owed the other any duty. There was no question as to any trust or confidential relations. There was no dispute as to the ownership of the property. Here the bank paid the entire tax. It was not the real owner of the property. It had the possession and control of the property, but, under the views we have expressed, it could only hold whatever title it had by virtue of the various transactions between the parties, for the benefit of Sanford, subject only to the extent of its security for the moneys it had advanced. The fact that it had the property assessed to itself instead of having it assessed as provided for in the constitution gave it no additional rights. It cannot be

allowed to take advantage of its own wrong. The principles announced in the Hibernia Case are not, when the difference in the facts is considered, in opposition to the conclusions we have reached. The decree of the circuit court is affirmed, with costs.