## BENDER v. KING et al.

### (Circuit Court, D. Montana. September 4, 1901.)

#### No. 96.

**1. JUDICIAL SALES—RIGHT OF REDEMPTION—MONTANA STATUTE.**

Code Civ. Proc. Mont. § 702, provides that, where the answer of a defendant admits a part of the claim sued on to be just, the action may be severed on plaintiff's motion, and judgment rendered on the part so admitted. A plaintiff sued on two distinct causes of action, and procured an attachment on both, which was levied on real estate. The action was subsequently severed under such statute, and judgment rendered on one of the causes of action, under which the attached property was sold to a third person; the action upon the remaining cause having been continued. *Held*, that the attachment as to such part still remained a lien upon the property, subject to the sale made under the judgment, and constituted a "subsequent lien," which entitled the plaintiff, under the statutes of the state, to redeem from the sale.

**2. SAME—SUCCESSIVE REDEMPTIONS.**

Redemption statutes are to be liberally construed, and where a subsequent lienholder, entitled to redeem from a sale of real estate under execution, from which previous redemptions have been made or attempted, pays to the sheriff the amount which the original purchaser is entitled to receive, together with the amount of the claims of the prior redemptioners, the money paid in will be treated in equity as having been paid for the benefit of the original purchaser to the extent of his claim, and a redemption will be effected, even though for any reason the prior redemptions were not effective.

**8. SAME—PAYMENT NECESSARY TO REDEEM—TAX-SALE CERTIFICATES.**

Code Civ. Proc. Mont. § 1235, requires one redeeming from a judicial sale to pay to the purchaser the amount of his purchase, with interest, "together with the amount of any assessment or taxes which the purchaser may have paid thereon after purchase," with interest. *Held,* that a purchase of the property at a sale for delinquent taxes, and the taking of a certificate of purchase therefor by the purchaser at the judicial sale, was not a payment of taxes on the property within the meaning of such provision, and that a redemptioner was not required to pay to the sheriff the amount of such certificate, since such payment, if made, would not operate to redeem from the tax sale and extinguish the lien, which could only be effected in the statutory manner by payment to the county or municipal treasurer.

**4. SAME.**

A purchaser of real estate at execution sale, who afterwards and while he holds the certificate buys the same at tax sale, does not thereby become a creditor of the judgment debtor, so as to bring him within the provision of Code Civ. Proc. Mont. § 1235, requiring a redemptioner from the execution sale, "if the purchaser be also a creditor having a prior lien to that of the redemptioner," to pay the amount of such lien in addition to the amount of the purchase in order to effect a redemption.

**5. FIXTURES—THEATER FURNISHINGS AND CHAIRS.**

A building was erected, arranged, fitted, and at all times used as an opera house for public entertainments, being incapable of use for other purposes without considerable alterations. It was fitted with a stage and stage fixtures, and appliances to facilitate the handling of scenery during theatrical performances, and a drop curtain. It also contained a large quantity of theatrical scenery, and was furnished with opera house chairs, such as are usually used in similar buildings, which were fastened to the floor with screws and nails. Such chairs were placed in the building by one who was at the time the owner, and who subsequently freed them from liens. *Held,* that all of such property, except the scenery, which was in no way attached to the building and was shown to be capable of being used as well in other theaters, constituted fixtures which were essential to the use of the building for the sole purpose to which it was devoted, and which passed to a purchaser of the building at a sale under execution.

In Equity. Suit to compel a conveyance of real estate and to recover rents and profits.

Forbis & Evans, for plaintiff.
J. K. Macdonald, for defendant King.
Roote & Clark, for defendant McFarland.
McHatton & Cotter, for defendant Murray.
Chas. O'Donnell, for defendant Grand Opera House Co.

KNOWLES, District Judge. The complainant is a citizen of the state of Washington, and the defendants are all of them citizens of the state of Montana. The matter in controversy exceeds in value the sum of $2,000, exclusive of interest, and involves certain real property situated in Butte, Silver Bow county, Mont., commonly designated and known as the "Grand Opera House," and is described as follows:

"The west 14 feet of lot No. 14, all of lot No. 15, and the east 17½ feet of lot No. 16, all in block No. 29, of the original townsite of Butte, according to the plat of the official survey thereof on file in the office of the county clerk and recorder of Silver Bow county, Mont., together with the tenements, hereditaments, and appurtenances."

The object of the suit is to have the defendant King declared to hold the legal title to said property in trust for the use and benefit of the complainant, and that he may be required to make, execute, and deliver a proper deed conveying to complainant said real property, together with the tenements, hereditaments, and appurtenances thereunto belonging or in any wise appertaining. As against Murray and the other defendants, it is to recover the rents, issues, and profits of the property, and certain stage scenery and appliances, drop curtains, and opera chairs and seats in said building contained, alleged to be fixtures attached to and forming a part of the realty, but which said Murray claims is property personal in its nature, and not fixtures attached to and forming a part of the realty, and that the same belongs to him. During the pendency of the suit a receiver was appointed to take charge of the property and collect the rents, issues, and profits thereof.

The evidence shows that on and prior to the 27th day of December, 1897, the defendant Grand Opera House Company was the owner of the real property in controversy, and that on said 27th day of December, 1897, said property was sold to the defendant King at sheriff's sale under an execution issued upon a judgment made and given in the district court of the Second judicial district of the state of Montana, in and for the county of Silver Bow, in a certain suit wherein one John O'Rourke was plaintiff and the Grand Opera House Company was defendant. O'Rourke's suit against the opera house company was upon two separate and distinct causes of action, and an attachment had been issued thereon and levied upon the property of the opera house company to secure the amount named in both causes of action set up in the complaint. Afterwards the two causes of action set out in O'Rourke's complaint were severed under the provisions of section 702 of the Code of Civil Procedure of Montana, and O'Rourke obtained a judgment against the opera house company upon one of his causes of action (being the one upon which execution was issued and under which the property was sold to King), and as to the other cause of action the suit was continued and is still pending in said court. Before the sale of the property to King as aforesaid, the complainant Bender and one John F. Forbis had begun suits against the opera house company, and at the time of the several redemptions hereinafter mentioned and referred to they were attachment and judgment creditors of the opera house company; said attachment and judgment liens being subsequent and subject to the prior lien of O'Rourke's judgment and his attachment lien. Within one year after the date of sale of the property to King, said O'Rourke, for the purpose of saving and protecting the lien of attachment still subsisting against the property under his cause of action, still pending and undetermined in his suit against the opera house company, gave notice of redemption, and paid to the then sheriff of Silver Bow county the amount due King on his certificate of purchase under the aforesaid execution sale, together with the proper amount of interest thereon by the statutes of Montana required to be paid on the redemption of real property from sales under execution. The complainant,

Bender, thereupon and within the time allowed by law gave notice of redemption to King and O'Rourke, and paid to the sheriff of said county, for said King and said O'Rourke, the amount of money required to pay said King and said O'Rourke the sums due on the sale under execution to King and on the redemption made by O'Rourke, together with the proper interest by law required to be paid in the premises. Thereupon, and still within the time allowed by law for a redemption, said Forbis gave notice of redemption to said King, O'Rourke, and Bender, and paid to said sheriff the amount required to reimburse King on his purchase at the aforesaid sheriff's sale; also the amounts due O'Rourke and Bender upon their several redemptions, together with proper interest. No other or further redemptions of said property were made or attempted to be made within the time allowed by law therefor, or at any other time prior to the bringing of this suit. Thereafter, said Forbis, in writing and for a valuable consideration, sold, assigned, transferred, and set over unto said Bender all the right, title, and interest which he (said Forbis) had acquired to said property under his said redemption, together with other liens against the opera house property which he then had and held. On January 19, 1899, notwithstanding the several redemptions effected from said sale under execution, the defendant King procured for himself a deed from the sheriff of Silver Bow county, in which said property was conveyed to him by said sheriff as the holder of the certificate of purchase under the execution sale made on the O'Rourke judgment, and said deed was filed in the office of the county clerk and recorder of Silver Bow county for record. Thereafter the complainant, Bender, gave notice of his rights in the premises to all of the defendants herein and demanded possession of the premises and the rents, issues, and profits thereof. The defendant Murray received and had notice, as well as the others. Notwithstanding the same, he negotiated a lease of the property to McFarland in the name of the opera house company, including therein, as the property of the opera house company, the very same property of which he claims to be the owner in this suit, and has collected, received, and has in his possession or under his control, about the sum of $6,000 of rents collected under said lease; said King never having collected or received any of said rents, issues, and profits.

It was sought to be shown on behalf of defendant King that said O'Rourke had failed to pay, in addition to the sum paid to the sheriff on redemption, the amount specified in certain certificates of sale to King of said property for delinquent state, county, and city taxes which had been assessed against the property, and that, as the purchaser of the property under these tax sales, said King had become and was a creditor of said opera house company, having a prior lien to that extent against its property, and over the O'Rourke, Bender, and Forbis judgments and redemptions, and that the payment of the amounts specified in these certificates of delinquent tax sales, with interest thereon, was a condition precedent without which a lawful and valid redemption of the opera house property could not be and was not effected by said redemptioners, O'Rourke,

Bender, and Forbis. It was also contended on behalf of said King that the attachment lien upon which said O'Rourke sought to redeem said property from said execution sale was not a subsequent lien to that under which the property was originally sold to said King; that the attachment lien of said O'Rourke, if any he had at all, had been abrogated and extinguished by reason of the judgment which he had obtained against the opera house company in the suit hereinbefore referred to, and that therefore he was not in fact a redemptioner at all under the statute; that the redemptions of said Bender and said Forbis were in fact merely redemptions from the redemption of O'Rourke, and were not redemptions from the sale to King; that said several notices of redemption on the part of said Bender and said Forbis were not addressed to King at all; and that they, like said O'Rourke, having failed or neglected to pay, or tender to him (King) the amounts specified in the certificates of sale for delinquent state, county, and city taxes, together with the proper interest thereon, they, too, had failed to effect a lawful and valid redemption of said property from him.

The first question presented is: Was O'Rourke a redemptioner under the statute, and entitled to redeem the property from the execution sale made to King? The complaint filed by O'Rourke in his suit against the opera house company was upon two separate and distinct causes of action. A writ of attachment had been issued and levied upon the property, and thereby created a lien upon the same to secure the amounts claimed and sued for in both causes of action. Under section 702, Code Civ. Proc. Mont., it is provided:

"Where the answer of the defendant, expressly or by not denying, admits a part of the plaintiff's claim to be just, the court upon the plaintiff's motion may, in its discretion, order that the action be severed; that a judgment be entered for the plaintiff for the part so admitted; and, if the plaintiff so elects, that the action be continued, with the like effect as to the subsequent proceedings, as if it had been originally brought for the remainder of the claim."

In following the provisions of this section, a plaintiff who elects to take judgment upon an admitted cause of action does not thereby abrogate or extinguish the lien of his attachment secured in the suit as originally commenced.

But it is claimed, however, that this attachment is not a subsequent lien to that upon which the property was sold. The sale made under the execution issued upon the judgment in favor of O'Rourke upon the admitted cause of action alleged in his complaint conveyed all the right, title, and interest of the opera house company to the property in dispute, subject, however, to the liens existing against the same. The sale was made at the instance of O'Rourke, and the certificate of sale issued to King recited such a sale. O'Rourke could in no way invalidate that sale. But, as I have indicated, O'Rourke's attachment lien was not wholly extinguished by the sale. His lien remained in force to the extent of the amount still claimed to be due him in his suit as originally brought. Under these circumstances, I hold that O'Rourke's attachment lien for the balance of his claim against the opera house company was made subject to the rights acquired under the sale, and hence was a subsequent lien, and this lien

gave him the right to redeem. Duboise v. Hepburn, 10 Pet. 1, 9 L. Ed. 325; Corbett v. Nutt, 10 Wall. 464, 19 L. Ed. 976; Schuch v. Gerlach, 101 Ill. 338. In Schuch v. Gerlach, supra, it is said:

"Redemptions are looked upon with favor, and, when no injury is to follow, a liberal construction will be given to our redemption laws, to the end that the property of the debtor may pay as many of the debtor's liabilities as possible."

This view would seem to be applicable to the redemption laws of Montana. Under it the opera house company was enabled to pay, not only the judgment obtained against it by O'Rourke on one of his causes of action, but also the amount claimed to be due under the remaining one. If, however, this position should not be sustained, it is evident that both Bender and Forbis intended to redeem from the sale to King, if the redemption of O'Rourke was ineffectual. Their notices of redemption are addressed to Silas F. King, as well ·as the opera house company and O'Rourke. In said Bender's notice it is recited:

"That he is entitled to redeem said property from said sale [that is, from the sale to King], and from said redemptioner John O'Rourke, and in accordance therewith, within one year after said sale, and within sixty days after said redemption by said John O'Rourke, upon the 27th day of December, 1898, has paid to P. H. Regan, sheriff of Silver Bow county, for said redemptioner John O'Rourke, the sum of $1,201.12, the amount paid or to be paid to said Silas F. King."

The notice of redemption of the redemptioner Forbis is also addressed to the opera house company, Silas F. King, P. H. Regan, sheriff, John O'Rourke, and J. O. Bender. In this notice it is claimed that he has a right to redeem from the sale made to King and from the redemptions of O'Rourke and Bender, and that he has paid to the sheriff the sum of $2,669.59, making a total of $1,201.12, the amount to be paid to said King, purchaser, together with $585 claimed by said O'Rourke as an attachment creditor, together with 2 per cent. on both of said sums, together with $795.40 claimed by Bender as a judgment creditor, together with 2 per cent. As it will be seen, the money paid by all of these parties, claiming to be redemptioners, was to the sheriff, and all recite that $1,201.12 is to be paid to King, and seek to protect him to the full extent of his legal rights. Under the doctrine announced in Perkins v. Center, 35 Cal. 713, a court of equity would treat the money paid to the sheriff to have been paid for the benefit of King. It was undoubtedly the intention of all of the parties that the amount due King should be paid to and remain in the hands of the sheriff for said King. I therefore have come to the conclusion that there was a proper and valid redemption made from the sale to King, unless the amount paid in was insufficient by reason of the failure to pay the amounts claimed by King on account of tax-sale certificates. To hold otherwise would require the strictest construction of the proceedings for redemption in such cases.

Prior to the redemptions hereinbefore referred to, the property in controversy had been assessed for certain state, county, and city taxes. The taxes became due and were delinquent. Not having been paid, the property was advertised for sale in pursuance of law,

111 F.—5

and sold for said delinquent taxes assessed against the same. At these sales said King became the purchaser, and certificates of sale were executed and delivered to him. It is contended for said King that as the holder of these certificates of sale for delinquent taxes he became and was a creditor of said opera house company, having a prior lien, and that in order to effect a valid and legal redemption it was necessary for and said redemptioners were required to pay to him the amount named in these certificates of sale, in addition to the amounts due him on account of his purchase of the property under the sale under execution, and, having failed or neglected to pay or tender said additional amounts so claimed to be due him, no valid redemption of said property from said sale under execution was effected. It therefore becomes an important question for the consideration of the court. Were the redemptioners required to pay, as a part of the redemption money, the amounts claimed to be due King on his certificates of purchase of the property under these tax sales? For a solution of this question resort must be had to section 1235 of the Code of Civil Procedure of Montana, which reads as follows:

"The judgment debtor, or redemptioner, may redeem the property from the purchaser any time within one year after the sale, on paying the purchaser the amount of his purchase, with 1 per cent. per month thereon in addition up to the time of redemption, together with the amount of any assessment or taxes which the purchaser may have paid thereon after purchase, and interest on such amount, and if the purchaser be also a creditor having a prior lien to that of the redemptioner, other than the judgment under which such purchase was made, the amount of such lien, with interest."

It will be observed that the amounts named in these certificates were not the amounts paid by King when these taxes became due, but upon a sale of the property at a delinquent tax sale. These certificates of sale created a lien upon the property, which lien, under the provisions of the statutes of Montana, could only be discharged in a particular way. In sections 3890 and 4871 of the Political Code it is provided:

"Sec. 3890. Redemption must be made in lawful money, and when paid to the county treasurer he must credit the amount paid to the person named in the county treasurer's certificate, and pay it on demand to the person or his assignees."

"Sec. 4871. The city or town treasurer has the same power to collect municipal taxes as the county treasurer has to collect state and county taxes, and has the same right to give notices, add penalties, seize and sell property for delinquent taxes, to give deeds to purchasers, and to do everything that a county treasurer might do in the premises, as provided in chapter 7, tit. 10, pt. 3, of this Code, except that he must make settlements with the city or town council, and all property sold for delinquent taxes must be bid in for the city or town."

For property sold for state and county taxes, and for property sold for city taxes, the money is to be paid to the county or city treasurer, as the case may be. A payment to the sheriff would not be a compliance with this statute. In a redemption from a tax sale, the statute must be strictly pursued, or no redemption will be effected. It cannot, therefore, be maintained that a requirement to repay the taxes paid by a purchaser under an execution sale and holding the certificate of sale applies to a case where the property

has been sold at public sale for delinquent taxes. It appears from the evidence that the complainant, Bender, subsequently and within the time allowed by law for the redemption of property sold for delinquent taxes, paid to the proper officials the money required to redeem this property from these tax sales; but the purchase of the property at these delinquent tax sales was not a payment of the taxes under most of the authorities. Such a purchase is not a payment of taxes, but a purchase of a new lien, independent of the estate acquired in the property under a sheriff's sale under execution. 2 Jones, Mortg. pp. 36, 37, § 1080; Cooley, Tax'n, pp. 500–509; 2 Desty, Tax'n, p. 932; Ror. Jud. Sales, § 1162; Williams v. Townsend, 31 N. Y. 411; Sidenberg v. Ely, 90 N. Y. 264, 43 Am. Rep. 163; Jones v. Wells, 31 Mich. 170; Insurance Co. v. Bulte, 45 Mich. 113, 7 N. W. 707; Waterson v. Devoe. 18 Kan. 232; Kelsey v. Abbott, 13 Cal. 619; Allison v. Corson (C. C.) 83 Fed. 752; Society v. Davidson, 38 C. C. A. 365, 97 Fed. 716; Kofoed v. Cosbey (Cal.) 54 Pac. 1115. The conclusion reached is that the redemptioners were not required to pay to the sheriff, for said King, the amounts named in the several certificates of sale for delinquent taxes, with interest thereon, in order to effect a legal and valid redemption of the property under the statute.

It was also contended that the defendant King was a "creditor" of the opera house company, having a lien prior to that of the redemptioners; that he became a creditor of said opera house company by the purchase of its property at said delinquent tax sales, which sales are specified in the certificates heretofore referred to. Was he a "creditor," within the meaning of this section of the statute, by reason of having purchased said property at tax sales? I hold that he was not, and this view is supported by the following authorities: Iowa Homestead Co. v. Des Moines Val. R. Co., 17 Wall. 1153, 21 L. Ed. 622; Osterberg v. Trust Co., 93 U. S. 424, 23 L. Ed. 964; Abidie v. Lobero, 36 Cal. 398; Trust Co. v. Weiss, 118 Cal. 489, 50 Pac. 697; Williams v. Townsend, supra; Raynsford v. Phelps, 43 Mich. 342, 5 N. W. 403, 38 Am. Rep. 189. A purchaser of property at an execution sale does not become, by this act, a creditor of the defendant in the cause in which the execution was issued. A purchaser at a tax sale can have no greater right to claim that he is a creditor of the defaulting taxpayer than a purchaser at an execution sale as above described. The purchaser at a tax sale obtains the lien of the state as against the particular property sold, and does not obtain the assignment of a personal debt.

The complainant being a redemptioner under the statute, and having effected a valid and legal redemption of the property of the opera house company from the execution sale to King, and being entitled to the conveyance to him of the legal title therein, the question arises as to what was embraced within that redemption that would pass to him as a part and parcel of the realty upon a conveyance of the legal title. The evidence shows that the building erected upon this land was erected, constructed, and used as an opera house from the very beginning, and that it is still used for that purpose; that it is suitable and adapted for and to such purposes, and could not well be

used for other purposes without considerable changes and alterations in its interior arrangement and condition as it now stands and is used; that it contains a stage and stage fixtures, and appliances to facilitate the expeditious handling of scenery during theatrical performances, a large amount of theatrical scenery, a drop curtain, and also a number of opera chairs and seats attached·to the floor by means of screws and nails. The scenery in question was attached to the stage only as needed, and is capable of being moved about without injury to the stage and stage fixtures or to itself, and for the most part was lodged or stored in certain storerooms in the basement of said building. The defendant Murray claims that all of these articles were and are personal property, and owned by him. In his testimony he claims to have acquired a title to the chairs above mentioned by a purchase thereof from one John Maguire, who prior to such purchase owned the same. He fixes the time at which he made this purchase at a date in 1893, and asserts that at that time he paid off and discharged a chattel mortgage upon the same held by one John O'Rourke. The evidence shows, however, that said O'Rourke, under a contract with said Maguire, canceled his chattel mortgage upon said chairs some time in the early part of the year 1891, and that said Murray had no connection with this transaction. Giving the testimony of said Murray all the credit it would be legally entitled to, still, taking into consideration the facts, as disclosed by the evidence of said Murray, that he made a redemption from the judgment owned by the First National Bank of Butte in order to protect a small judgment which had been assigned to him, and that he never did actually pay any money or other valuable thing to said Maguire by means of this redemption from the said bank, as a consideration for the alleged sale of these chairs, and that said Maguire retained the possession of the same for a long time after the alleged sale, I do not feel warranted in adjudging him to be the owner of said chairs.

True, there is a disclaimer of ownership of the chairs on the part of the opera house company, and an averment that said Murray is the owner of them. There was also introduced in evidence the resolution of the board of trustees or directors of the opera house company to the effect that Murray be allowed a monthly rental for these chairs, etc. But, after a consideration of all the evidence as a whole, it definitely appears that this was all done at a time when said Murray, by purchase or otherwise, had obtained control of a majority of the stock of the corporation; that he elected a majority or all of the trustees or directors of said corporation; that the trustees acting at the time said resolution was adopted were all of them in some way identified with Murray's interest and subject to his control. Maguire was his agent, Chapman was a clerk in his bank, and O'Donnell was his attorney. So far as the record shows, none of the minority stockholders of the corporation were present, or represented in this transaction, and their rights do not appear to have been considered or deemed worthy of consideration. The corporation was heavily involved in debt. The transaction as a whole appears to have been colorable and suspicious, and I am unwilling

to consider it as a corroboration of Murray's claim of ownership by purchase of the property. It does not commend itself as entitled to much weight, and is not conclusive as evidence of Murray's ownership. Then there is the further uncontradicted evidence that a lease in which this very same property is described was negotiated by said Murray with the defendant McFarland. This lease was executed by and in the name of the Grand Opera House Company. Murray was cognizant of the fact that the opera house company was being held out to said McFarland as the owner of this property. He stood by and helped to clothe the opera house company with the apparent ownership and title to this very property to a stranger to its title. It seems to me that, if said Murray is not precluded from repudiating the good faith of his acts and conduct in the premises, it goes far to weaken his claim of ownership to the property. The same may be said with reference to the answer and disclaimer of the opera house company in the premises. It executed a lease of this property to McFarland. Presumably lessor and lessee acted in good faith at the time, and both ought in equity and good conscience to be bound by it; but notwithstanding it executed the lease in due form and in writing, and held itself out to a stranger as the owner of the property, it comes into a court of equity and solemnly denies that it is now or ever was the owner of the property now claimed by said Murray. This is remarkable, to say the least. Then, again, we have the remarkable circumstance of Murray, having negotiated this lease for the Opera House Company as the owner of the property, repudiating the whole transaction by notifying the receiver that he (Murray) is the owner and entitled to the possession of this property, and must either pay rent therefor or surrender its possession, and threatening its removal in default thereof; and all this in the face of the fact that the tenant under the lease was in good faith complying with the terms and conditions of his lease, and had not made default in any of its covenants. If it was the property of the opera house company for the purposes of a lease thereof to McFarland, and that lease in full force at the time, why should it change its character of title and ownership so soon after the receiver was appointed? These facts are all of them inconsistent with Murray's testimony as to his claim of ownership. I find, therefore, that said Murray never purchased said chairs as he claims, and that he is not the owner thereof.

At the time said chairs were placed in said opera house, Maguire owned said house and purchased said chairs for use in the same. For a time O'Rourke held a chattel mortgage upon the same; but when this mortgage was canceled the full legal title to the chairs passed to Maguire. They then undoubtedly became fixtures in said building. It is clear from the evidence that the Grand Opera House would have been incomplete as an opera house without these chairs; and these chairs, or similar chairs, were absolutely necessary in its use and occupation for theatrical performances; and said chairs, affixed as they were, became and were a part of the building itself, and passed to King in virtue of the sheriff's deed to the premises. The case of Insurance Co. v. Allison (C. C. A.) 107 Fed. 179, is direct-

ly in point with the case at bar. Judge Wallace, speaking for the circuit court of appeals for the Second circuit, referring to chairs attached to the floor by screws and nails, as these were, said:

"The auditorium chairs were turn-over chairs, upholstered in plush, and of the mechanical construction adapting them to be placed in rows and secured to the floor. They were placed over the carpets in rows, and fastened to the floor by screws. * * * It would seem that chairs attached and arranged substantially as these were are essential to the uses to which an auditorium is appropriated. We think he should have instructed them [the jury] that, attached as they were, if they were, as to size, upholstering, mechanical construction, and general arrangement, adapted to conform to the auditorium, that fact would indicate an intention that they were to be regarded as fixtures. * * * If they were arranged as they generally are in such rooms, occupying the whole area of the auditorium when divided into the necessary aisles, we think, in view of the other evidence, that it should have been ruled as a matter of law that they were fixtures. An auditorium without seating capacity would be incomplete, and the chairs as generally arranged and constructed in such a room are essential to the use to which that part of the building is appropriated."

See, also, Oliver v. Lansing (Neb.) 80 N. W. 829.

The stage, stage fixtures, and drop curtain attached thereto fall within the same rule. They are fixtures. In regard to the scenery, however, it does not appear that it was substantially affixed to the building, or that it was specially designed, constructed, and fitted for the building. It appears from the uncontradicted testimony of Mr. Maguire that this scenery might be used in any other theater, and that he had at times used portions thereof in other playhouses in the state of Montana. Mr. McFarland testified that this scenery, when used, was lashed to or on the stage in some way. The precise manner in which this was done is not disclosed. Taking the general knowledge possessed by the court of stage scenery, it must infer that it was only lashed temporarily, and not permanently affixed to the building. Under this evidence the court cannot hold that it is a part of the building. This view is also supported by the circuit court of appeals in Insurance Co. v. Allison, supra. In the case of Oliver v. Lansing (Neb.) 80 N. W. 829, it was held that certain theatrical scenery used in a building was a part of the same. In that case the evidence showed that the scenery was specially constructed for and fitted to this building. In that particular the case differs from the one at bar. While the court finds that this theatrical scenery is not a part of the building in question, I do not recall any evidence that would justify the court in holding that the defendant Murray is the owner of the same. It is not necessary to decide who is the owner thereof. As far as the pianos are concerned, these certainly cannot be classed as a part of the building. From their very nature they are personal property, and cannot pass to the complainant under a deed to the realty.

It is therefore ordered that a decree be entered in this cause requiring defendant Silas F. King to convey to the complainant, John O. Bender, all his right, title, and interest of, in, and to the real property described in the bill, with the appurtenances. Among these are embraced the stage, stage fixtures, and appliances attached to the stage, the drop curtain attached thereto, and the chairs, attached

and fastened to the floor by screws and nails. The court also finds that said complainant is entitled to the rents, issues, and profits derived from the property described in the bill from the 11th day of March, 1899, the date on which said complainant was entitled to a sheriff's deed thereof, and that, defendant Murray having received said rents, issues, and profits with full knowledge and notice of the complainant's rights in the premises from said date down to the 1st day of February, 1900, he is required to account to the complainant therefor, and make restitution thereof and pay the same, with legal interest. Complainant is also entitled to his proper costs incurred in this suit.